## FOX PACKING CO. v. FLEMING.
### No. 375.

United States Emergency Court of Appeals.

Heard at Baltimore Jan. 31, 1947.

Decided May 2, 1947.

D. Heyward Hamilton, Jr., of Baltimore, Md. (Cummings & Stanley, of Washington, D. C., and Hershey, Donaldson, Williams & Stanley, of Baltimore, Md., on the brief), for complainant.

Irving J. Helman, Atty., and William R. Ming, Jr., Asst. Gen. Counsel, both of Washington, D. C. (Carl A. Auerbach, Gen. Counsel, and Prentice A. Hilburn, Atty., both of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MA-GRUDER and LINDLEY, Judges.

MAGRUDER, Judge.

The Fox Packing Company seeks relief in this proceeding under § 2 of the Act of June 23, 1945, Pub.L.No. 88, 79th Cong., 1st Sess., 59 Stat. 260, 15 U.S.C.A. § 606b note, relating to the special subsidy to nonprocessing slaughterers of cattle.

This special subsidy had been provided pursuant to a Directive of the Economic Stabilization Director issued October 25, 1943 (8 F.R. 14641), reading in part as follows:

"5. Slaughterers who during the year 1942, or a representative portion thereof, sold and who currently sell 98% or more of the total dressed carcass weight of cattle slaughtered by them in the form of carcasses, wholesale cuts, frozen boneless beef (Army specifications) (carcass equivalent) or ground beef, shall be paid in addition to the payments authorized by Regulation No. 3 of Defense Supplies Corporation (Livestock Slaughter Payments), the amount of $0.80 per cwt. of cattle slaughtered during the month for which such payments are made.

"6. Defense Supplies Corporation is directed to amend Regulation No. 3 (Livestock Slaughter Payments) in accordance with this Directive."

In compliance with the foregoing, Defense Supplies Corporation, on October 30, 1943, issued Amendment No. 2 to its subsidy regulation, reading in part as follows:

"Pursuant to a directive issued by the Office of Economic Stabilization on October 25, 1943 (8 F.R. 14641), Regulation No. 3 of Defense Supplies Corporation is hereby amended by adding a new § 7003-14, as follows:

"§ 7003.14 Extra compensation for nonprocessing slaughterers of beef—(a) Definitions. (1) 'Non-processing slaughterer of beef' means an unaffiliated slaughterer as hereinafter defined who during six consecutive months of 1942, sold, and who currently sells, 98% or more, measured in dressed carcass weight, of the total beef produced from cattle slaughtered by him in all his establishments, in the form of carcasses, wholesale cuts, boneless beef or ground beef.

"(2) 'Unaffiliated slaughterer' means a slaughterer who does not own or control a processor or purveyor of meat, and who is not owned or controlled by a processor or purveyor of meat. 'Unaffiliated slaughterer' shall not include any institution, representative or agency of Federal, State or local governments.

"(3) 'Processor or purveyor of meat' means a person who processes fresh beef or sells or dispenses fresh or processed meat or products containing meat, at wholesale or at retail, or in a hotel, restaurant or other eating establishment.

"(4) 'Own or control' means to own or control directly or indirectly a partnership equity or in excess of ten percent of any class of outstanding stock or to have made loans or advances in excess of five percent of the other person's monthly sales.

\*     \*     \*     \*     \*     \*

"(c) Filing claims. (1) Claims for extra compensation shall be filed in the same manner as, for the same period as, and with, the applications for payment provided for in §§ 7003.1 through 7003.5 of this regulation.

\*     \*     \*     \*     \*     \*

"(d) Payment of claims. Defense Supplies Corporation will make payment on approved claims for extra compensation at the rate of .8 cents a pound on the same amount of live weight of cattle slaughtered on or after November 1, 1943, on which payments are made to the applicant under §§ 7003.1 through 7003.5 of this regulation. \*  \*  \*"

Amendment No. 2, though it was issued on October 30, 1943, was not published in the Federal Register until February 16, 1944 (9 F.R. 1820). In the early months, there was some confusion and misunderstanding as to the conditions of eligibility for the special subsidy. Also, the affiliation provisions in Amendment No. 2 were not in the Directive pursuant to which the special subsidy was established, and there was doubt whether the Defense Supplies Corporation was authorized to add further conditions on eligibility not contained in the Directive. This question, which was not without some difficulty, was finally answered in the affirmative by our decision in Earl C. Gibbs, Inc., v. Defense Supplies Corporation et al., 1946, Em.App., 155 F.2d 525, certiorari denied 67 S.Ct. 51.

Meanwhile, many non-processing slaughterers had collected the special subsidy over a considerable period in entire good faith. Demands for repayment were made by Defense Supplies Corporation in cases in which the slaughterer was deemed to be affiliated with a processor or purveyor of meat, within the meaning of Amendment No. 2. In some cases the slaughterers, upon pain of having the basic subsidy withheld from them in the future, were constrained to make arrangements with Defense Supplies Corporation for repayment by installments. The necessity for refunding special subsidies already collected often worked extreme hardship, where the slaughterer, had he realized his technical ineligibility, could have promptly taken steps to remove the disqualifying affiliation. Officials of the Reconstruction Finance Corporation [1] called the matter to the attention of Congress and suggested remedial legislation. As a result Congress passed the Act of June 23, 1945, 59 Stat. 260, 15 U.S.C.A. § 606b note, referred to at the beginning of this opinion and hereinafter called Public Law 88. Section 2 of the Act reads as follows: "Any slaughterer who heretofore or hereafter shall have received extra compensation payments under Livestock Slaughter Payments Regulation Numbered 3 of Defense Supplies Corporation (adopted pursuant to directives of the Director of Economic Stabilization) when such slaughterer was not in a class eligible for such extra compensation payments, shall be relieved, in whole or in part, of obligation to repay the amount thereof and shall be entitled to receive, in whole or in part, the amount of such extra compensation payments repaid by such slaughterer to, or withheld by Defense Supplies Corporation on account of such extra compensation payments, to the

---

[1] Defense Supplies Corporation, a wholly owned subsidiary of Reconstruction Finance Corporation (6 F.R. 2972), was dissolved, and its functions transferred to Reconstruction Finance Corporation by the Act of June 30, 1945, 59 Stat. 310, 15 U.S.C.A. § 606b note.

extent that it is determined by the Director of Economic Stabilization, or any agency of the Government authorized by him, that it would be inequitable for Defense Supplies Corporation to require repayment by such slaughterer or to retain the amounts so repaid or withheld, provided such Director or agency also determines that such slaughterer believed reasonably and in good faith that he was eligible to receive such extra compensation payments: Provided, That any determination by such Director or agency under this section shall be reviewable by the Emergency Court of Appeals under such rules as such court may prescribe."

By Directive issued July 2, 1945, the Economic Stabilization Director delegated his powers under § 2 of the Act to the Price Administrator (10 F.R. 8242). On August 10, 1945, the Price Administrator issued Procedural Regulation 15, prescribing the procedure for applying for relief under the Act (10 F.R. 9957). The Fox Packing Company made such an application, and was turned down by the Price Administrator, after which the company filed the present complaint in this court.

Complainant, a Maryland corporation, is a non-processing slaughterer of cattle with a plant at Baltimore. It has an authorized capital stock of 1,000 shares. At the time the special subsidy was established, 400 shares were owned by American Stores Company, which operates a chain of retail grocery stores and is a "purveyor of meat" within the meaning of the subsidy regulation as amended. The other 600 shares were owned by three brothers, Morton Fox, Edwin B. Fox, and Nelson Fox, as joint tenants.

In the middle of November, when Morton Fox, president of complainant, first learned that the extra subsidy to non-processing slaughterers had been authorized, he procured and filled out DSC Form 84 entitled "Statement Establishing Eligibility for Extra Compensation Under Amendment No. 2 to Regulation No. 3 of Defense Supplies Corporation." It was thereby disclosed to Defense Supplies Corporation that American Stores Company, a purveyor of meat at retail, owned 40 per cent of the outstanding capital stock of complainant. We note at this point, for it has a bearing on the reasonableness of complainant's subsequent conduct, that though DSC Form 84 required a disclosure of "all persons who now own 10% or more of any class of outstanding stock of the applicant", it did not call for any disclosure of outstanding loans.

By letter dated November 29, 1943, Defense Supplies Corporation advised complainant of its ineligibility for the special subsidy because of the ownership of more than 10 per cent of its stock by American Stores Company. Morton Fox asked his attorney for advice, but at that time they were unable to obtain copies of the subsidy regulation and of Amendment 2 at the local office of Defense Supplies Corporation. On December 1, 1943, complainant, by Morton Fox, president, replied to Defense Supplies Corporation that, as of December 1, 1943, "we have notified the American Stores Company of our intention to purchase this stock on which up to the present time we have paid eight thousand dollars." This might perhaps have implied that the corporation itself was buying in the outstanding stock, but actually the transaction took the form of an individual purchase by the three Fox brothers of the 400 shares of stock from American Stores Company for the price of $32,000, of which $3,000 was paid in cash and the balance covered by a joint and several promissory note executed by Morton Fox, Edwin B. Fox, and Nelson Fox. The transfer was made as of December 1, 1943.

Also on December 1, 1943, complainant executed its claim for livestock slaughter payments on DSC Form DS-T-46 for the period from November 1 to November 27, amounting to $18,795.70 for the basic subsidy and $13,669.60 for the special subsidy. This form made no inquiry as to outstanding loans. The claim for the extra subsidy for this period was not paid by Defense Supplies Corporation because of complainant's ineligibility, as aforesaid.

Morton Fox and his attorney went to the Washington office of Defense Supplies Corporation on December 18, 1943, and made to Miss M. P. Enders of that office what the Price Administrator concedes to be a "full

disclosure" of the transaction whereby American Stores Company ceased to be a stockholder of complainant and the Fox brothers, not complainant, became indebted to American Stores Company in the sum of $29,000. As a result of this conference complainant received from Defense Supplies Corporation a letter dated December 22, 1943, signed by an official of that agency who had not been present at the conference on December 18. This letter was as follows:

"Defense Supplies Corporation,
Washington 25, D. C.,
December 22, 1943.

The Fox Packing Company,
2601 W. Franklin Street, Baltimore, Maryland.

Gentlemen: This is in regard to your eligibility for extra compensation as a non-processing slaughterer of beef.

We have carefully considered the facts given in your letter and also your explanation to us in our conversation of December 18. We are of the opinion that your letter of December 1, taking up the option to repurchase your stock from American Stores Company, has cured your ineligibility for the month of November. The ownership of stock by American Stores Company makes you ineligible for the extra compensation during that month, regardless of the reason for which this stock was originally transferred to the American Stores Company.

The transaction in regard to repurchasing the stock from American Stores Company seems to us to present a somewhat borderline case. We are willing, however, to accept it as a bona fide cutting-off of your affiliation with American Stores Company on the assumption that $29,000 does not constitute five per cent of the monthly sales of The Fox Packing Company.

Our conclusion is that The Fox Packing Company has made itself eligible for the extra compensation for slaughter of beef on and after December 1, 1943, provided The Fox Packing Company has met all the other requirements of eligibility such as current sales of 98% of their beef slaughter at wholesale.

We are sending a copy of this letter to our agent in Richmond, and are returning to you the copies of correspondence which you left with us.

Very truly yours,
(Signed) John H. Patterson,
John H. Patterson,
Special Assistant.

Enclosures."

Morton Fox took this letter to be an unequivocal ruling that complainant's ineligibility had been cured by the termination of the stock ownership by American Stores Company. He did not perceive the significance of the stated assumption in the third paragraph of the letter "that $29,000 does not constitute five per cent of the monthly sales of The Fox Packing Company." The stock ownership had been the original basis of ineligibility, and this was what Morton Fox's attention had been focused upon. At that time he had not been informed that outstanding loans, either of the applicant or its stockholders, might have a bearing upon eligibility. As above stated, neither DSC Form 84 nor Form DS-T-46, which complainant had filled out, contained any reference to loans. In fact at that time neither complainant's president nor its attorney had seen the text of Amendment No. 2; but if they had, they would not thereby have been informed that Defense Supplies Corporation was interested not only in loans owing by an applicant for the subsidy, but also in loans owing by stockholders of the applicant. It appeared to Morton Fox that Mr. Patterson, the writer of the above letter, was under the mistaken impression that The Fox Packing Company owed the $29,000, and, since this was not the case, it did not occur to Mr. Fox that the debt of the stockholders had any bearing on complainant's eligibility. Thereafter Mr. Fox informed complainant's attorney that complainant had been declared eligible as of December 1, 1943, but did not read the letter to him or send him a copy.

In 12 succeeding monthly periods, complainant continued to file its claims for the special subsidy. These claims were filed on another form, No. DS-T-51, which required the applicant to certify that "no person who processes fresh beef or sells or dispenses fresh or processed meat or products containing meat, at wholesale or at retail, or in

a hotel, restaurant or other eating establishment, has during any part of the period covered by this claim * * * made loans or advances to the applicant in excess of 5% of the applicant's total sales of meat during the period covered by this claim." Complainant so certified; and it is apparent that such a certificate could have honestly been made. In the first place, the form seems to require only a disclosure of loans or advances made during the particular monthly period covered by the claim. In the second place, the inquiry is as to loans "to the applicant"—that is, The Fox Packing Company. A business man reading the form would hardly receive the impression that the corporate entity was to be disregarded and a disclosure made of loans or advances to the stockholders.

These claims for the special subsidy were without question paid by Defense Supplies Corporation in the aggregate sum of $196,-370.80.

On January 4, 1945, complainant filed its claim for the special subsidy for the period from December 4, 1944, to December 30, 1944. This claim Defense Supplies Corporation failed to pay. When complainant's president inquired as to the reason, he was informed that it was because of the indebtedness of the Fox brothers to American Stores Company. It is conceded that the amount of this indebtedness exceeded 5 per cent of complainant's monthly sales at all times. Mr. Fox was also informed that complainant would be required to restore the total amount of the extra subsidies theretofore received and that Defense Supplies Corporation would withhold any and all basic subsidies and special subsidies to which complainant might be entitled in the future, to be applied on account of such restitution. Immediately, the Fox brothers paid and discharged in full the note held by American Stores Company, and Defense Supplies Corporation on being informed of this fact acknowledged complainant's eligibility for the special subsidy in the future.

Upon consideration of complainant's application for relief, the Price Administrator, on August 27, 1946, issued an order of denial, in which order he certified to Reconstruction Finance Corporation "that he is unable to make the affirmative finding that The Fox Packing Company of Baltimore, Maryland, believed reasonably that it was eligible to receive such extra-compensation payments required by the provisions of Section 2 of the Act of June 23, 1945, Public Law 88, 79th Congress, 1st Session." In an opinion accompanying the order, the Price Administrator relied for his conclusion wholly upon the third paragraph of the above-quoted letter of December 22, 1943, written by Defense Supplies Corporation to complainant. This, the Price Administrator stated, was a sufficient warning to complainant "against the prospect of future ineligibility in the event the designated $29,-000.00 indebtedness constituted 5 percent or more of the company's monthly sales during any calendar month." Under the circumstances, the opinion continued, "the course any reasonably prudent person would have followed in the conduct of his affairs of comparable importance at least would have caused such person to make inquiry concerning the applicability of the warning rather than to assume that the warning had been given as the result of a mistaken view of the factual situation, and hence had no applicability."

Possibly it is true, as complainant indeed asserts, that complainant in fact and in law was entitled to the special subsidy under the terms of Amendment No. 2 to the subsidy regulation. This depends upon whether, upon a fair interpretation of the affiliation provisions of Amendment No. 2, the corporate entity of The Fox Packing Company is to be disregarded, so that its stockholders, the three Fox brothers, may be treated in effect as a partnership engaged in the business of slaughtering cattle—otherwise the $29,000 debt of the three brothers to American Stores Company could not be said to be a loan or advance "in excess of five percent of the other person's monthly sales", within the meaning of that portion of Amendment No. 2 defining "own or control".[2] Cf. Greenhouse Bros. & Finkelstein, Inc. v. Reconstruction Finance Cor-

---

[2] In that definition, the phrase "directly or indirectly" is used with reference to owning or controlling stock in excess of 10 per cent, but is absent from that portion of the definition relating to loans or advances.

poration, Em.App., 1947, 159 F.2d 712, certiorari denied 67 S.Ct. 1200.

■ We think we are not called upon to decide in this proceeding whether Defense Supplies Corporation was correct in ruling that complainant was ineligible for the special subsidy during the period in question, and we intimate no opinion upon the point. Respondent in his brief states that he is "constrained to forego" the argument that if complainant was in fact eligible to receive the extra compensation payments, "it is not entitled to relief under Public Law 88, there is no basis for its application under that Act and this Court would have no jurisdiction to review the denial of the application." For the purpose of applying for relief under Public Law 88, the slaughterer is entitled to take the subsidy-paying agency at its word on its ruling of ineligibility. Otherwise, the Price Administrator, before passing on the application for relief, would have first to determine whether the applicant had been properly ruled to be ineligible for the special subsidy. But such a ruling would not, of course, be binding on the Reconstruction Finance Corporation; and in this awkward situation a slaughterer who might be entitled either to the subsidy under the terms of the subsidy regulation or to relief under Public Law 88 might be treated to something of a "runaround". Further, if this court should now determine that complainant was eligible for the special subsidy under the terms of the subsidy regulation and therefore that the present complaint should be dismissed, such determination would not be binding on the Reconstruction Finance Corporation which is not a party to the present suit. Therefore, we think that complainant's application for relief under Public Law 88 must be without prejudice to its right to assert in some other proceeding that Defense Supplies Corporation was in error in ruling that complainant was ineligible for the special subsidy during the period the loan was outstanding.[3]

Under the terms of Public Law 88, a slaughterer is entitled to relief upon a determination that the slaughterer "believed reasonably and in good faith that he was eligible to receive such extra compensation payments" and a further determination that it would be "inequitable" under the particular circumstances to require such slaughterer to make repayment of the amounts so received. Upon the record before us, an inference of good faith would seem to be inescapable. As soon as complainant was informed, in January, 1945, that the existence of the loan to the stockholders rendered complainant ineligible to receive the special subsidy, the stockholders promptly paid off the loan and thus removed the disqualification. If complainant, and its stockholders, had known during 1944 that complainant's eligibility was affected by the existence of the loan, they would hardly have jeopardized the subsidy during all that period; rather, they would have paid off the loan, or at least reduced it so that it was no longer in excess of 5 per cent of complainant's monthly sales. The existence of the loan had been disclosed to Defense Supplies Corporation back in December, 1943.

■ Complainant takes the position that if the Price Administrator determines that "a non-processing slaughterer believed in good faith that it was eligible for extra compensation and that it would be inequitable to require that such payments be repaid or be withheld, then it is entitled to relief under the Statute"; it is argued that as a matter of statutory construction "the phrase 'reasonably and' is redundant when taken in connection with the phrase 'in good faith'." We cannot treat the statutory word "reasonably" as a superfluity. If Congress had meant to require only subjective good faith, it would not have added the word "reasonably", which connotes an objective standard. We find nothing in the legislative history to compel a different conclusion, even assuming that it would be

---

[3] Public Law 88 affords relief only to the extent that the slaughterer actually received payment of the extra subsidy to which he was not entitled. Therefore in the present proceeding complainant could not in any event obtain relief with reference to the special subsidy for the period from December 4, 1944, to December 30, 1944, because the claim for that period was never paid to complainant by Defense Supplies Corporation. See Illinois Packing Co. v. Henderson, Em.App., 1946, 156 F.2d 1000, 1001, certiorari denied 67 S.Ct. 202.

permissible to resort to legislative history for the purpose of reading the word "reasonably" out of the statute.

On the other hand, Public Law 88 is remedial legislation, and should be given a liberal interpretation. Whether a slaughterer "believed reasonably" that he was eligible to receive the extra compensation must not be judged in the calculating light of hindsight and afterthought, upon a lawyer's scrutiny of the relevant documents. No doubt Morton Fox now realizes that he would have saved complainant a lot of unnecessary grief had he considered more sharply, and made further inquiry as to, the possible implications of the third paragraph of Defense Supplies Corporation's letter of December 22, 1943, above set forth. But in the light of the situation at the time this letter was received, we think it clear that Mr. Fox did not fail to measure up to the standard of a business man of ordinary circumspection. He had filled out DSC Form 84 to establish complainant's eligibility for the special subsidy. He had also filled out DSC Form DS-T-46 claiming the extra compensation for the period November 1 to November 27, 1943. By slipshod draftsmanship, apparently, neither of these forms made any inquiry as to outstanding loans. The forms, therefore, certainly tended to be misleading, and may serve to explain why Morton Fox was not more on his guard as to the possible significance of outstanding loans when he received the letter of December 22, 1943. The form for monthly filing was thereafter revised, but even the new form, No. DS-T-51, while it required a certificate that no processor or purveyor of meat had made loans "to the applicant in excess of 5% of the applicant's total sales of meat during the period covered by this claim", did not require any disclosure as to outstanding loans to stockholders—which, it would seem, Defense Supplies Corporation should have specifically inquired about if they had regarded such information as relevant to the applicant's eligibility. And even if Mr. Fox had

at that time succeeded in obtaining a copy of Amendment No. 2 to the subsidy regulation, he still could have read it as a business man of ordinary intelligence without getting the impression that The Fox Packing Company would be rendered ineligible not only by the existence of corporate indebtedness in the amount stated, but also by the existence of loans to its stockholders.

The Price Administrator's disposition of the application in this case is to be contrasted with his action in granting relief under Public Law 88 pursuant to similar applications by Earl C. Gibbs, Inc., and Illinois Packing Company. In the case of Earl C. Gibbs, Inc., the indebtedness was owed by the corporation itself, and the applicant for the special subsidy there was ineligible under the clear and unambiguous language of the subsidy regulation as amended. See Earl C. Gibbs, Inc. v. Defense Supplies Corporation, Em.App., 155 F.2d 525, supra. In the Illinois Packing Company case, 48 per cent of the common stock of the slaughtering corporation was owned by Pfaelzer Brothers, a processor and purveyor of meat, so that the applicant there was also clearly ineligible under the language of the subsidy regulation. See Illinois Packing Co. v. Henderson et al., Em.App., 156 F.2d 1000, supra.

In the present case, the Price Administrator denied the application for relief under Public Law 88 because he concluded —erroneously, we believe—that he was "unable to make the affirmative finding that The Fox Packing Company of Baltimore, Maryland, believed reasonably that it was eligible to receive such extra-compensation payments". He therefore found it unnecessary to make the other determinations which are a prerequisite to relief under Public Law 88.

A judgment will be entered setting aside the Price Administrator's order denying relief issued August 27, 1946, and remanding the case to his successor, the Temporary Controls Administrator,[4] for further proceedings not inconsistent with this opinion.

---

4 See Executive Order 9809, 50 U.S.C.A.Appendix, § 601 note, 11 F.R. 14281.