## BELLE CITY PACKING CO. v RECON-STRUCTION FINANCE COR-PORATION.

### No. 445.

United States Emergency Court of Appeals.
Heard at Washington April 24, 1948.
Decided Aug. 2, 1948.

Warren Woods, of Washington, D. C. (Roberts & McInnis, of Washington, D. C., on the brief), for complainant.

George Arthur Fruit, Atty., Department of Justice, of Washington, D. C. (Joseph M. Friedman, Sp. Asst. to Atty. Gen., and Jack W. Loeb, Atty., and John C. Erickson, Counsel, both of the Reconstruction Finance Corporation, both of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MA-GRUDER and LINDLEY, Judges.

MAGRUDER, Judge.

Complainant, Belle City Packing Company, here challenges the validity of a ruling or determination by the Reconstruction Finance Corporation that complainant was ineligible, during certain monthly accounting periods, to receive the special subsidy payable to nonprocessing slaughterers of cattle under the provisions of Amendment No. 2 (9 F.R. 1820) to Regulation No. 3 (8 F.R. 10826) issued by Defense Supplies Corporation.[1]

Since the subsidy regulation had been issued pursuant to § 2(e) of the Emergency Price Control Act of 1942, 56 Stat. 26, 50 U.S.C.A.Appendix, § 902(e), the foregoing

---

[1] Defense Supplies Corporation, a wholly owned subsidiary of RFC (6 F. R. 2972), was dissolved, and its functions trans- ferred to RFC by the Act of June 30, 1945, 59 Stat. 310, 15 U.S.C.A. § 601 note.

ruling or determination by the RFC thereunder was in effect a "regulation or order under section 2," subject to protest under § 203(a) of the Act, 50 U.S.C.A.Appendix, § 923(a), and to review in the Emergency Court of Appeals under § 204(a), 50 U.S. C.A.Appendix, § 924(a). Illinois Packing Co. v. Bowles, Em.App.1945, 147 F.2d 554; Illinois Packing Co. v. Snyder, Em.App. 1945, 151 F.2d 337; Greenhouse Bros. & Finkelstein, Inc. v. RFC, Em.App.1947, 159 F.2d 712, certiorari denied 1947, 331 U.S. 812, 67 S.Ct. 1200, 91 L.Ed. 1832; Armour & Co. v. RFC, Em.App.1947, 162 F.2d 918, 923. Though the Price Control Act terminated on June 30, 1947, 60 Stat. 664, the jurisdiction of this court in the case at bar is preserved by § 1(b) of the Act, 50 U.S.C.A.Appendix, § 901 (b), since the protest and complaint are founded upon an asserted "right" in complainant, with a corresponding "liability" of respondent, incurred under the subsidy regulation prior to such termination date. Our jurisdiction has not been challenged.

Amendment No. 2 to the subsidy regulation aforesaid established a special subsidy to non-processing slaughterers pursuant to a directive of the Economic Stabilization Director issued October 25, 1943 (8 F.R. 14641), and attached certain conditions to the payment of such subsidy. To be eligible for the special subsidy, a non-processing slaughterer, as defined, had to be an "unaffiliated slaughterer," that is, it could not "own or control" or be "owned or controlled by," a "processor or purveyor of meat." The phrase "own or control" was defined as meaning: "to own or control directly or indirectly a partnership equity or in excess of ten percent of any class of outstanding stock or to have made loans or advances in excess of five percent of the other person's monthly sales. * * *"

The validity of these affiliation provisions of the subsidy regulation has already been upheld by us in Earl C. Gibbs, Inc., v. DSC, Em.App.1946, 155 F.2d 525, certiorari denied 1946, 329 U.S. 737, 67 S.Ct. 51, 91 L.Ed. 637; Atlantic Meat Co., Inc. v. RFC, Em.App.1946, 155 F.2d 533, certiorari denied 1946, 329 U.S. 737, 67 S.Ct. 52, 91 L.Ed. 637; Illinois Packing Co. v. Henderson, Em.App. 1946, 156 F.2d 1000, certiorari denied 1946, 329 U.S. 783, 67 S.Ct. 202, 91 L.Ed. 671. We refer to our opinions in those cases for discussion of the legal basis of the subsidy program, the purpose of the differential subsidy to nonprocessing slaughterers, and the rationale of the aforesaid affiliation provisions. Complainant does not now press any argument as to the validity of any provisions of the subsidy regulation, but insists that the adverse ruling of respondent as to complainant's eligibility is contrary to law as being based upon an erroneous interpretation of the regulation as written.

Belle City Packing Company was incorporated under the laws of the State of Wisconsin on April 20, 1944, with an authorized capital stock of 250 shares of no par value, of which 148 shares were held by David Fagel, 100 shares by James Gottlieb, and one share each by the wife of David Fagel and by Paul Phillips. David Fagel was president, treasurer and a director. The other two directors were Mrs. Fagel and Phillips. Shortly after its incorporation, the company opened up business in Racine, Wisconsin, as a non-processing slaughterer of livestock.

Prior to April 15, 1944, David Fagel had been a partner with his brother Max Fagel in Fagel Brothers Wholesale Meat Company, of Chicago, Illinois, a partnership business engaged in the purveying of meat to hotels, restaurants and retail outlets in Chicago, and admittedly a "processor or purveyor of meat" within the meaning of the subsidy regulation. Upon advice of counsel, David Fagel, on April 15, 1944, disposed of his interest in the partnership by selling the same to his brother for the agreed price of $15,000. Max Fagel paid for the purchase by $1,000 in cash and by the execution and delivery of a promissory note to David Fagel in the amount of $14,000. The bill of sale was duly recorded on April 19, 1944, in Cook County, Illinois, and the bona fides of this transfer is unquestioned. Thereafter, David Fagel was completely dissociated from the management and business of Fagel Brothers Wholesale Meat Company conducted by his brother as sole proprietor; and Belle

City Packing Company never made any sales of meat products to, nor had any other business relations with, said Fagel Brothers Wholesale Meat Company.

If David Fagel had not disposed of his interest in the partnership, it is clear that the newly created corporation, Belle City Packing Company, could not have qualified for the special subsidy as an "unaffiliated slaughterer," for David Fagel, as a partner in Fagel Brothers Wholesale Meat Company, would have been, in that event, a "processor or purveyor of meat" owning or controlling in excess of 10 per cent of the outstanding capital stock of Belle City Packing Company. Somerville Dressed Meat Co. v. RFC, Em.App.1947, 159 F.2d 716.

Complainant filed its claims for the special subsidy for the accounting periods May 18–June 3, 1944, June 5–July 1, 1944, and July 3–29, 1944. In August, 1944, David Fagel volunteered to a representative of DSC in Chicago the information that he held the promissory note of his brother for $14,000 as above mentioned. Upon the strength of this information, David Fagel was told that the claim of Belle City Packing Company for the special subsidy for slaughter in May, June and July would have to be rejected, and that the company would remain ineligible for the special subsidy for so long as this indebtedness was outstanding. David Fagel thereupon promptly extinguished the indebtedness by permitting his brother to take up the note for the sum of $6,500 in final settlement.

■ Respondent persists in its view that, while this note for $14,000 was outstanding, there was a disqualifying affiliation between Belle City Packing Company and a "processor or purveyor of meat." We do not agree.

The debt was owed by Max Fagel to David Fagel in the latter's individual capacity, and arose out of a personal transaction between the brothers before Belle City Packing Company was even in existence. The note never became an asset of Belle City Packing Company. Under the circumstances of this case, it would be a wholly unwarranted straining of the language of the subsidy regulation to hold that Belle City Packing Company "controlled" Fagel Brothers Wholesale Meat Company, within the meaning of the affiliation provisions, because Belle City Packing Company had made a "loan or advance" to Max Fagel, the sole proprietor of Fagel Brothers Wholesale Meat Company. As already stated, David Fagel was not the sole stockholder of Belle City Packing Company—there was an outstanding 40 per cent stock interest held by James Gottlieb. The corporate entity cannot be disregarded and Belle City Packing Company treated as the "alter ego" of David Fagel.

None of our previous decisions sustains respondent's position. We noted in Fox Packing Co. v. Fleming, Em.App.1947, 161 F.2d 209, 214, what we think is of some importance, that the subsidy regulation in its definition of "own or control" uses the phrase "directly or indirectly" with reference to owning or controlling a stock interest in a corporation in excess of 10 per cent, but does not use the phrase "directly or indirectly" in that portion of the definition relating to loans or advances. In Greenhouse Bros. & Finkelstein, Inc. v. RFC, supra, over 50 per cent of the outstanding stock of the claimant slaughterer was held by the officers and sole stockholders of Renee Packing Company, Inc., a processor or purveyor of meat. We pointed out that there was thus a disqualifying affiliation between the slaughterer and the processor or purveyor of meat because Renee Packing Company, Inc., through its officers and sole stockholders, might be deemed to control "indirectly" more than the disqualifying amount of stock of the slaughterer. In Atlantic Meat Co., Inc. v. RFC, supra, Atlantic Meat Co., Inc., which was a wholly owned and controlled subsidiary of General Foods Corporation, was held to be ineligible for the special subsidy because General Foods Corporation was also a "processor or purveyor of meat" through Batchelder & Snyder, another wholly owned subsidiary. Earl C. Gibbs, Inc. v. DSC, supra, is distinguishable because there the corporate applicant for the special subsidy was itself indebted to a processor or purveyor of meat on account of a loan in a sum in excess of 5 per cent

of the debtor's monthly sales, the debt being secured by a mortgage upon the debtor's plant.

Complainant made its claims for the extra subsidy on Form No. DS-T-51, furnished by DSC. This form required the applicant for the subsidy to certify certain facts with reference to the accounting period covered by the particular subsidy claim. Presumably the form represented the subsidy-paying agency's interpretation of the eligibility requirements of the regulation. The form required the certification that the "applicant has not, during any part of the period covered by this claim, been affiliated with" a processor or purveyor of meat, by "making loans or advances to such person in excess of 5% of such person's monthly sales." The applicant was Belle City Packing Company, not David Fagel. Belle City Packing Company was required to certify that *it* had not made a loan or advance to a processor or purveyor of meat. A business man reading the form would hardly receive the impression that, to be eligible for the subsidy, it was also necessary for the applicant to certify that no stockholder of the applicant had made such a loan or advance in his individual capacity. The interpretation now urged by respondent would truly convert the regulation, with its accompanying reporting form, into a booby trap to snare the unwary business man. It might have been reasonable to enlarge the affiliation provisions of the subsidy regulation *so as to* cover loans or advances by or to stockholders, particularly majority stockholders, of non-processing slaughterers or of "processors or purveyors of meat"; but that is not the way the regulation was written. Cf. Maloney Packing Co. v. RFC, Em.App. 1947, 159 F.2d 717.

Subsequently, complainant found itself, innocent and unsuspecting, in another pitfall, under the regulation as interpreted by respondent.

Complainant's asserted disqualifying affiliation having been removed by extinguishment of the promissory note for $14,000 of Max Fagel to David Fagel, its claims for the extra subsidy for the August, September and October, 1944, accounting periods were paid by DSC. Later, upon examination of complainant's books, it developed that certain customers of complainant, who fell within the category of "processors or purveyors of meat," as defined, had from time to time made payments to complainant, on account of purchases of meat, a few days in advance of actual deliveries by complainant, in amounts in excess of 5 per cent of complainant's monthly sales. DSC asserted that such advance payments constituted disqualifying "loans or advances," and that therefore the special subsidy payments for August, September and October, 1944, had been erroneously made. Accordingly, DSC reimbursed itself for these alleged improper payments by withholding from complainant an equivalent amount due to complainant on account of the basic livestock slaughter subsidy for the ensuing accounting periods.

Since complainant had in good faith received payment of the special subsidies for August, September and October, 1944, to which RFC subsequently claimed complainant was not entitled, complainant petitioned the Office of Price Administration for relief under the remedial provisions of § 2 of the Act of June 23, 1945, Pub L. No. 88, 79th Cong., 1st Sess.—59 Stat. 260. On April 18, 1947, the Temporary Controls Administrator, who had succeeded to the functions of the Price Administrator, issued an order granting relief in full, determining that it would be inequitable for RFC to require repayment by complainant of the special subsidies received by it for those months, and further determining that complainant believed reasonably, and in good faith, that it was eligible to receive such special subsidy payments.

That took care of complainant's claims for the months of August, September and October, 1944. But respondent contends that advance payments by customers of complainant, of the nature above stated, rendered complainant ineligible to receive the extra subsidy for the earlier accounting periods, May, June and July—this in addition to the asserted ground of ineligibility previously discussed in this opinion, namely, the indebtedness of $14,000 from Max Fagel to David Fagel. Respondent also

contends that similar advance payments by customers disqualified complainant to receive the special subsidy for the accounting periods November and December, 1944, and January, 1945. Since complainant never received payment of the special subsidy for May, June, July, November and December, 1944, nor for January, 1945, complainant could not claim relief under the terms of the Act of June 23, 1945, above cited. See Fox Packing Co. v. Fleming, Em.App.1947, 161 F.2d 209, 215. Due, as complainant claims, to its inability to collect the special subsidies, complainant was forced to close its business on January 27, 1945. The hardship to which complainant has been subjected is obvious.

In regard to these payments by complainant's customers covered by deliveries of meat shortly thereafter, it seems to us that respondent has applied to the provisions of the subsidy regulation a strictness of interpretation beyond all reason. The ruling is that, under the definitions in the regulation, Belle City Packing Company was "owned or controlled" by "processors or purveyors of meat". But the disqualifying affiliation specified in the regulation worked both ways; a non-processing slaughterer was equally ineligible for the special subsidy if he "owned or controlled" a "processor or purveyor of meat." Therefore, under the interpretation advanced by respondent, a slaughterer ran the risk of being excluded from the special subsidy unless the purchaser of meat by his customer was a cash transaction at the time of delivery. That is, if the customer sent in his order on Monday, accompanied by his check to cover the purchase, and the slaughterer, having accepted the order, filled it by delivery of meat on Friday, the slaughterer, although during the five-day interval he owed the purchaser not money but meat, would thereby be rendered ineligible for the special subsidy provided it turned out that the amount of such purchase exceeded 5 per cent of the slaughter-er's sales for the monthly accounting period. Likewise, if the slaughterer delivered a carload of meat to a customer on Monday, and the customer made payment the following Friday, there would exist a disqualifying "loan or advance" during this brief interval provided it turned out that the amount thereof exceeded 5 per cent of the customer's monthly sales.[2] On the respondent's theory, it would not seem to matter whether the time interval between payment and delivery, or delivery and payment, as the case might be, was two, four, ten or twenty days; in any such case the slaughterer could not make the necessary certificate that no disqualifying loan or advance had been made during any part of the period covered by the claim.

Bearing in mind that, by the terms of the subsidy regulation, the presumption of control, in the circumstances specified, is absolute and irrebuttable (Earl C. Gibbs, Inc., v. DSC, supra), we think that the affiliation provisions ought not to be construed to cover the ordinary commercial transaction of purchase and sale, where the transitory obligation to deliver meat already paid for, or to pay for meat already delivered, is wholly incidental.

There is no more reason in the nature of things why a seller should deliver meat and trust the buyer to pay for it than there is why a buyer should pay over his money and trust the seller to deliver the meat. In a seller's market, when buyers are clamoring for a commodity in short supply, it is indeed not surprising that buyers should be willing to make payment ahead of delivery. Such a willingness, rather than indicating a likelihood that the seller is under the buyer's control, might, with greater plausibility, indicate that the seller is in the driver's seat.

In the case at bar, complainant's transactions with its customers appear to have been ordinary commercial transactions of purchase and sale. Complainant had about

---

[2] This is a necessary deduction from respondent's argument, though respondent does not explicitly say so. Respondent contends that, so far as the potentiality of control is concerned, the important thing is the existence of an indebtedness, no matter how the indebtedness came into being. Since its notion of an "advance" is something furnished before an equivalent is received, the delivery of meat on credit would in that sense be an advance.

75 customers, many of which were small local concerns. Its largest sales, however, were mostly made to four or five big Eastern concerns. David Fagel stated in his affidavit "that in some instances I would receive advances from customers ordering usually in carloads of beef and would then balance these advances against the cost of the carload of beef at the time of delivery, adjusting our reciprocal obligations at that time." Complainant's bookkeeper explained that delay in making shipments "was frequently unavoidable due to the shortage of railroad refrigerated cars and the shortage of meat hooks. Occasionally a delay was the result of labor shortages, particularly over week-ends." The lag was often only a few days, sometimes as much as ten days, and sometimes maybe longer, especially during the latter months, though specific figures as to this are lacking in the record. Though the large Eastern customers referred to appear to have customarily made payments in advance of delivery, this was by no means invariably so; in some instances it was the other way around.

The first accounting period here involved was May 18 to June 3, 1944. Five per cent of complainant's sales during that period amounted to $2,170.30. The only advance payment for this period relied upon by respondent as rendering complainant ineligible was one by Independent Meat Dealers Co-op of New York City. Complainant's ledger discloses that this customer was debited in the amount of $4,546.46 for a delivery on May 20, which the customer substantially covered by a payment of $4,500 on May 24. On May 26 this customer was credited with a payment of $15,000, which complainant more than covered shortly thereafter by deliveries on May 27, May 31, and June 3, in the amounts of $9,129.97, $4,023.29, and $5,128.02, respectively. But because for a few days during the accounting period complainant's ledger showed a balance in this customer's favor in excess of 5 per cent of complainant's sales for the accounting period, the re-spondent insists that complainant was ineligible to receive the special subsidy. The language of the regulation is not so crystal-clear as to compel so absurd a result. Respondent seeks to sustain its rejection of complainant's subsidy claims for the remaining monthly accounting periods involved on the same untenable ground, that at "some time during each of such monthly accounting periods the payments received or amounts outstanding from at least one, and during some months more than one of such customers exceeded five percent of the Complainant's monthly sales."

We recognize that the potentiality of control, as between a slaughterer and his customer, might arise if a slaughterer got in too deeply with unfilled orders for which a particular customer had paid in advance, so that a heavy adverse balance was consistently maintained for a significant period of time, or if a customer got too far behind in payments for meat already delivered. In view of the purpose of the special subsidy, as we explained in Earl C. Gibbs, Inc. v. DSC, supra, it might therefore have been reasonable to enlarge the terms of the affiliation provisions so as to deal specifically with these situations. But if respondent had done so, we are confident that it would not have expressed the disqualification in the extreme and sweeping sense it now seeks to attribute to the regulation as written. As already stated, we do not think that the language "loan or advance" may fairly be taken to refer to the ordinary commercial transaction of purchase and sale, where the transitory obligation to deliver meat already paid for, or to pay for meat already delivered, is wholly incidental.

A judgment will be entered setting aside the determination of respondent that complainant was ineligible to receive the special subsidies for the accounting periods here involved, setting aside respondent's order of October 16, 1947, denying the protest, and remanding the case to respondent for further proceedings not inconsistent with this opinion.