217 F.2d 312
 SERVICE PIPE LINE COMPANY, a Corporation,
v.
RECONSTRUCTION FINANCE CORPORATION.
 No. 662.
 United States Emergency Court of Appeals.
 Heard at Oklahoma City, May 24, 1954.
 Decided December 7, 1954.
 
 T. W. Arrington and Ray S. Fellows, Tulsa, Okl., with whom Cecil L. Hunt and Charles R. Fellows, Tulsa, Okl., were on the brief, for complainant.
 Anthony L. Mondello, Atty., Department of Justice, Washington, D. C., with whom Warren E. Burger, Asst. Atty. Gen., and Marvin C. Taylor, Atty., Department of Justice, Washington, D. C., were on the brief, for respondent.
 Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
 MAGRUDER, Judge.
 
 
 1
 This case involves the validity of an order issued under Defense Supplies Corporation Regulation 7 — Stripper Well Compensatory Adjustments (10 F.R. 6773).
 
 
 2
 Complainant Service Pipe Line Company, which corporation was formerly known as Stanolind Pipe Line Company, is engaged in the transportation by interstate pipe line, for others and for hire, of crude petroleum from the fields where produced to connecting carriers and refineries.
 
 
 3
 For purposes of such transportation, complainant gathers the oil from the producers' tanks through a network of pipe lines which are called gathering lines. The gathered oil goes into a pump station, where it is pumped into complainant's trunk pipe line and started on its way to refineries or to connecting carriers. The oil is relayed by pump stations located at intermediate points along the trunk line to its ultimate destination. As the oil is gathered from numerous leases, it is commingled so that the oil from any one lease completely loses its identity in the general mixture of the oil taken from all leased tanks connected to the gathering pipe line. When it is pumped at the gathering station into the trunk line, it is further commingled with all other oil being transported in the pipe line and becomes what is called the common stream. Oil or crude petroleum is accepted for transportation by complainant only on condition that it shall be subject to such changes in gravity, quality, or market value while in transit as may result from the commingling in the common stream with other crude petroleum in complainant's pipe lines or tanks. Complainant is under no obligation to make delivery of the identical crude petroleum which it may receive; but all crude petroleum received for shipment may be delivered out of the common stream at destination.
 
 
 4
 It is a well-recognized fact in the business of transporting crude petroleum by pipe line that losses occur between points of receipt and delivery thereof, losses resulting principally from breaks and leaks in the line, overflow of tanks, tank fires, evaporation, shrinkage due to temperature changes, the formation of sediment, the existence of water in the oil, etc. Complainant is allowed a tariff deduction of one-half of one per cent of the quantity of crude petroleum received by it from shippers for transportation; but aside from this deduction, it is obligated to deliver to its customers at the refinery, or to a connecting carrier, the same quantity which it has received for transportation and delivery. It may be that in the long-run average this deduction of one-half of one per cent is sufficient to cover losses of the sort described. But during shorter periods this is not necessarily so, for due to particularly bad accidents or disasters complainant has on occasion suffered losses of more than 130,000 barrels of petroleum during a thirty-day period.
 
 
 5
 Also, complainant has followed a long-accepted practice in the pipe line business of withdrawing from the common stream quantities of crude petroleum, as needed, for use and consumption as fuel to operate complainant's Diesel engines that furnish power for the pump stations located along its pipe line system. There is no way of identifying the petroleum so withdrawn or of knowing from what shipper or producing field it was originally secured.
 
 
 6
 Since 1939 complainant has followed the practice of making purchases from producers of crude petroleum sufficient to provide it with a substantial excess inventory to take care of eventualities and catastrophes and to make sure that it has on hand at all times enough crude petroleum to meet its delivery obligations, for the allowable one-half of one per cent deduction, aforesaid, has not been enough to cover the losses of the sort above described and the withdrawals from the common stream from time to time to run the Diesel engines at the various pump stations along the line. Among the producers from whom complainant has made such purchases of crude petroleum since 1939 has been Continental Oil Company, which owns and operates a number of oil leases in Montague County, Texas.
 
 
 7
 Under the regime of price control pursuant to the Emergency Price Control Act of 1942, 56 Stat. 23, 50 U.S.C.A.Appendix, § 901 et seq., there were two price regulations having a bearing upon the present case — Revised Maximum Price Regulation 436 (9 F.R. 6024), imposing maximum prices, speaking generally, on sales and deliveries of crude petroleum, and Maximum Price Regulation 88 (9 F.R. 7137), imposing maximum prices, again speaking generally, on various crude petroleum products, including fuel oil.
 
 
 8
 It had developed that in some instances crude petroleum was being purchased and used as fuel, and this presented to the Price Administrator the problem whether such purchases should be priced under RMPR 436 or MPR 88. Without going into the details of the Price Administrator's dealing with this particular problem, it will suffice for present purposes to say that he concluded that it would be preferable to treat crude petroleum sold or ultimately to be used for other than refining purposes in the same manner as fuel oil; that is to say, that MPR 88 should be the governing regulation in such cases. Accordingly, § 2 of RMPR 436 (9 F.R. 6024) made that regulation applicable to "all sales and deliveries of crude petroleum" except "crude petroleum when sold * * to a consumer for a purpose other than the production of more than one petroleum fraction therefrom * * *"; in other words, RMPR 436 was not to be applicable to sales of crude petroleum to a consumer for other than refining purposes. Correspondingly, § 1.1 of MPR 88, as amended by Amendment 11, included within the coverage of that regulation "Crude petroleum when sold * * to a consumer * * * for a purpose other than the production of more than one petroleum fraction therefrom * *" (9 F.R. 7138).
 
 
 9
 So the matter stood on August 1, 1944, when the oil subsidy program, now to be described, went into effect.
 
 
 10
 Prior to that date, the authorities in charge of the stabilization program had become concerned with the maximum prices in RMPR 436 as applied to certain marginal high-cost production wells known as stripper wells. It was decided to institute a federal subsidy designed to give to these stripper wells an added price incentive to maintain production, thus avoiding the necessity of making a general crude oil price increase deemed inconsistent with the stabilization program.
 
 
 11
 Pursuant to an overriding Directive issued by the Director of the Office of Economic Stabilization on June 28, 1944, the subsidy program was put into operation as of August 1, 1944, by the conjoint action of Defense Supplies Corporation (to which respondent Reconstruction Finance Corporation is the statutory successor, 59 Stat. 310) and of the Price Administrator.
 
 
 12
 Regulation 7 — Stripper Well Compensatory Adjustments (10 F.R. 6773), issued by Defense Supplies Corporation, set forth the terms and conditions for the payment of the subsidy. The word "crude" as used in the regulation was defined to mean "crude petroleum." The phrase "designated area" was defined to mean "any pool or area listed in OPA Revised Maximum Price Regulation 436, section 12, hereto attached as Schedule A and made a part hereof." Section 7007.5 of the subsidy regulation, dealing with the amount of claims, provided in part as follows:
 
 
 13
 "(a) A claim with respect to the purchase of crude produced from any designated area shall be in an amount equal to the number of barrels of such crude purchased and paid for multiplied by the excess, if any, by which the amount per barrel paid for such crude exceeds the amount per barrel which the Office of Price Administration had specified as the maximum price which could be charged or paid for such crude prior to August 1, 1944: Provided, however, That such claim shall in no event be greater than an amount equal to the number of barrels of such crude purchased and paid for, multiplied by the amount per barrel appearing in the attached Schedule A opposite the designated area in which such crude was produced."
 
 
 14
 Claims for subsidy were to be filed monthly on forms provided by Defense Supplies Corporation, in accordance with instructions contained on such forms. By § 7007.4 of the regulation, Defense Supplies Corporation reserved the right to examine an applicant's books and records to verify the validity and correctness of claims and to require recoupment, upon demand, of previously paid claims found incorrect upon examination or audit.
 
 
 15
 The Schedule A referred to and incorporated into the subsidy regulation was a copy of the schedule inserted in RMPR 436 by Amendment 4 thereto issued by the Price Administrator on August 1, 1944, and effective the same day (9 F.R. 9406). Section 12 of RMPR 436, as thus amended, provided that the lawful maximum price for crude petroleum sold by a producer to a "claimant" should be increased by the amounts listed in the schedule with respect to the large number of stripper wells deemed to need the special price incentive. The pools listed in the schedule as entitled to this special maximum price increase were, we understand, all the pools throughout the country producing on the average less than nine barrels daily per well. See the Price Administrator's Statements of Considerations involved in the issuance of Amendments Nos. 2 and 4 to RMPR 436, in Fuel Desk Book, 1 Pike & Fischer OPA Price Service, pp. 2103, 2104. Included in the pools listed in the schedule, with a few exceptions not now relevant, were "All pools in Montague County", Texas, as to which 35 cents per barrel of 42 gallons was stated to be the amount of the increased price permitted in purchases of crude petroleum by a "claimant" from a producer operating such pools. The word "claimant" was defined in § 12 of RMPR 436, as thus amended, to mean "a person who is designated as eligible to file a claim under the Stripper Well Compensatory Regulation of the Defense Supplies Corporation."
 
 
 16
 It thus is evident that the provisions of the subsidy regulation were closely articulated with the provisions of the related price regulation, RMPR 436, as amended. A "claimant", as defined, was permitted to pay the extra 35 cents per barrel for purchases of crude petroleum from a producer operating the pools in Montague County, and having paid such permitted excess was entitled to be reimbursed the amount thereof by the filing of monthly claims therefor with the Defense Supplies Corporation, the subsidy-paying agency of the federal government. No one was entitled to claim such reimbursement unless the purchases of crude petroleum upon which his claims were based were governed by RMPR 436, as amended. Thus if a producer of crude petroleum sold the same "to a consumer for a purpose other than the production of more than one petroleum fraction therefrom", the maximum price therefor was governed by MPR 88, not RMPR 436; and even though the purchaser, under the mistaken belief that RMPR 436 was applicable, paid to the stripper well producer the extra 35 cents per barrel over and above the maximum prices for crude petroleum which had been specified in RMPR 436 prior to August 1, 1944, nevertheless such purchaser was not, by the terms of the subsidy regulation, entitled to apply to the Defense Supplies Corporation for reimbursement of the amount of such excess price.
 
 
 17
 This oil subsidy remained in effect from August, 1944, through November, 1946. During that period, complainant consumed a total of 1,215,088 barrels of crude petroleum as fuel for the Diesel engines in the pump stations located along its interstate pipe line. In the same period, complainant made purchases of 1,345,977 barrels of crude petroleum and introduced the same into the "common stream" of its trunk line destined for delivery to refineries or to connecting carriers for ultimate delivery to refineries. Most of these 1,345,977 barrels were not purchased from stripper wells, and so presented no problem of subsidy. But of this number, purchases to the extent of 435,937 barrels were made from stripper wells in Montague County, Texas, operated by Continental Oil Company.
 
 
 18
 During the same subsidy period, complainant transported and delivered to refineries direct, or through connecting carriers ultimately to refineries, 242,645,976 barrels of oil. At least 15,000,000 barrels of this oil, and in all likelihood a great deal more, was subsidy oil, purchased by various refiners from stripper wells and delivered to complainant for transportation through its pipe line system. All of the immense quantity of crude petroleum introduced into complainant's pipe line, including of course the 1,345,977 barrels of crude petroleum which complainant itself had purchased, became intermingled in one steady common stream of oil being transported to refinery destinations; the source of any particular oil in the stream became completely unidentifiable.
 
 
 19
 With respect to the purchases of 435,937 barrels of crude petroleum which complainant made from Continental Oil Company during the subsidy period, complainant — in all good faith, as far as appears — paid this producer the price for stripper oil prescribed by Amendment No. 4 to RMPR 436, which included the extra 35 cents per barrel authorized to be paid for crude petroleum from stripper wells in the particular designated area.
 
 
 20
 Complainant filed with Defense Supplies Corporation, and, after its dissolution, with respondent Reconstruction Finance Corporation, monthly claims for reimbursement of the amount of the claimed subsidy with respect to its purchases from Continental Oil Company. The total of these claims was $139,489.00, of which Defense Supplies Corporation and its successor RFC paid to complainant the sum of $134,252.00, leaving an unpaid balance of $5,237.00 representing complainant's claim for the concluding month of November, 1946.
 
 
 21
 Of course the interpretation and application of this particular subsidy regulation require an interpretation of RMPR 436, as amended, the related price regulation. We think that complainant's purchases of the 435,937 barrels of crude petroleum from Continental Oil Company, in the circumstances above related, were covered by the maximum prices established in RMPR 436, and therefore that complainant was entitled to reimbursement of the premium payments it made to Continental Oil Company in reliance upon the provisions of the subsidy regulation.
 
 
 22
 It is perfectly true that if complainant had not followed the business practice, established long before the institution of the subsidy program, of withdrawing from its pipe line crude oil as needed for fuel at its various pump stations, but had, instead, purchased crude petroleum from stripper wells and delivered the same directly to the pump stations for use as fuel for the Diesel engines, then such purchases would have been governed by MPR 88, rather than RMPR 436, for they would have been purchases by "a consumer for a purpose other than the production of more than one petroleum fraction therefrom". But that was not the way the business was done, and the difference was not a mere matter of form.
 
 
 23
 RMPR 436 applied to "all sales and deliveries of crude petroleum" except "crude petroleum when sold * * * to a consumer for a purpose other than the production of more than one petroleum fraction therefrom * * *." Complainant introduced those 435,937 barrels into the common stream being transported through its pipe lines to refinery destinations. The particular oil was not purchased by complainant to be consumed as fuel; indeed complainant was not actually a consumer of any of the 435,937 barrels of oil, except that possibly, by way of happenstance, an insignificant and unidentifiable fraction thereof might later have found itself commingled with oil withdrawn by complainant from time to time to use as fuel at its various pump stations. But it is asserted that complainant must be deemed to have been a "consumer" of the 435,937 barrels of oil, within the meaning of RMPR 436 and MPR 88, because all the oil introduced into complainant's pipe line was "fungible" and the 435,937 barrels were purchased merely to replace a similar quantity of oil already withdrawn by complainant from the common stream for fuel purposes. This, however, is not an accurate characterization of what happened. Complainant made purchases of crude petroleum from time to time, as needed, to provide it with a sufficient excess inventory to take care of eventualities, which might include large losses occurring somewhere along the line, and to make sure that it had on hand at all times enough crude petroleum to meet its delivery obligations. Complainant's purchases of crude petroleum, therefore, had no necessary correlation with the amounts of oil it had theretofore consumed as fuel.
 
 
 24
 It may be granted that if the Price Administrator and Defense Supplies Corporation had thought about the particular problem while drafting the applicable regulations, it might have been entirely reasonable for them to have inserted some provisions to cut down the amount of subsidy payments to complainant and others similarly situated. We suspect it would have been difficult to draft such provisions in a form that would have been fair to the pipe line companies as well as administratively workable. It would hardly have been fair to deprive the pipe line companies altogether of subsidies on account of their purchases of crude petroleum from stripper wells. For instance, suppose complainant had made a particular purchase from a stripper well to replace in its pipe line a tremendous amount of oil lost through fire, breakage, or other catastrophe, and not adequately covered by the allowable one-half of one per cent deduction. Complainant could in no sense have been regarded as a "consumer" of the oil so purchased, and it is difficult to see why anyone would think that complainant ought not to have been entitled to make a subsidy claim based upon such purchase. It was well-understood at the time of the formulation of the stripper well subsidy scheme that the amount of crude oil delivered at the terminus of a pipe line would necessarily be less than the amount of the oil that went into the line, and yet it was agreed that the measurement determining the amount of the subsidy payment should be at the receiving tank, i. e., the tank in which the crude petroleum from one or more wells is first gauged or measured for sale and delivery. See 10 F.R. 6773.
 
 
 25
 However that all may be, and whatever the stabilization authorities might have inserted in the regulations with reference to the particular situation, had they thought of it, the plain fact is that the regulations contained no apt language excluding purchases of crude petroleum of the sort here involved from the general coverage of RMPR 436. The regulations have the force of law, binding on the subsidy-paying agency, and respondent is obligated to make payment of the subsidies called for by the terms of the subsidy regulation, as properly interpreted. Regardless of the fact, if it be a fact, that after the subsidy applicant had taken action in reliance upon the terms of the regulation it came to be recognized that it would have been wise to insert in the subsidy regulation some provision cutting down the subsidy in some particular, RFC is bound nevertheless to administer the regulation as written. We have many times so held. See Maloney Packing Co. v. R. F. C., Em. App.1947, 159 F.2d 717, 720; Earl C. Gibbs, Inc., v. R. F. C., Em.App.1948, 169 F.2d 654; Belle City Packing Co. v. R. F. C., Em.App.1948, 169 F.2d 413, 418; King Packing Co. v. R. F. C., Em. App.1952, 196 F.2d 514, 518.
 
 
 26
 What we have said so far indicates our view on the merits of this case. It remains only to resume the chronological narrative for the purpose of indicating how the case came before us.
 
 
 27
 Under date of October 18, 1946, RFC wrote to complainant that, upon audit of the latter's claims for stripper well compensatory adjustments, it appeared "that your Claims have included crude oil purchased directly from producers and utilized as fuel oil in the operation of your pipe line pump stations"; that an opinion had been obtained from the Office of Price Administration that oil so purchased "was not eligible to receive the premium price payments under the rules and regulations of RMPR 436." The letter concluded as follows:
 
 
 28
 "In view of the foregoing it is requested that you refund to this Corporation all sums previously claimed and paid to you on the above mentioned crude oil, included in your Claims through the month of June 1946, which was utilized by you as fuel oil in the operation of your pipe line pump stations. Your remittance should be accompanied by a schedule reflecting by Claims the number of Barrels of Crude so utilized as fuel oil and included in Claims filed by you, and the amount of Compensatory Adjustments claimed thereon."
 
 
 29
 After some correspondence, complainant refused to refund to RFC the amounts of subsidy payments theretofore received, as demanded in this letter of October 18, 1946, whereupon RFC brought suit against Stanolind Pipe Line Company (as complainant was then called) in the United States District Court for the Western District of Oklahoma. The district court granted judgment against RFC on its claim to recover the total amount of $134,252.00, and in favor of Stanolind Pipe Line Company on its counterclaim in the amount of $5,237.00. Reconstruction Finance Corp. v. Stanolind Pipe Line Co., D.C., 95 F. Supp. 716 (1951). On appeal, the United States Court of Appeals for the Tenth Circuit reversed the judgment of the district court. Reconstruction Finance Corp. v. Service Pipe Line Co., 1952, 198 F.2d 775. It was the view of the court of appeals that RFC's letter of October 18, 1946, was an "order" for repayment, of the sort contemplated and authorized by § 7007.4(c) of the subsidy regulation (10 F.R. 6773); that since Regulation 7 was a regulation or order issued under authority of § 2(e) of the Emergency Price Control Act, the administrative order for refund issued thereunder was also a regulation or order under § 2(e) of the Act and, being such, its validity could be questioned only in the Emergency Court of Appeals; that RFC's action in the district court was in effect an action for the enforcement of this order which, under the Act, the district court was obliged to consider as valid, unless and until it should be determined to be invalid by decision of the Emergency Court of Appeals.
 
 
 30
 Accordingly the Court of Appeals for the Tenth Circuit, in reversing the judgment of the district court, gave directions to enter judgment for RFC as prayed for in its complaint and against the pipe line company on its counterclaim, without prejudice to the right of the pipe line company to apply to the district court, under § 204(e) of the Emergency Price Control Act, as amended, 61 Stat. 619, for leave to file in the Emergency Court of Appeals a complaint against RFC attacking the validity of the said letter-order of October 18, 1946, 198 F. 2d at page 779.
 
 
 31
 Thereupon, pursuant to leave granted by the district court, Service Pipe Line Company filed its complaint, No. 632, in this court. By order entered July 17, 1953, we dismissed this complaint on technical jurisdictional grounds, on the authority of our previous ruling in Silver Pine Oil Co. v. R. F. C., Em.App.1953, 205 F.2d 835.
 
 
 32
 After that, Service Pipe Line Company, following our suggestion in the Silver Pine Oil Company case, filed its protest with RFC against the letter-order of October 18, 1946. On October 1, 1953, RFC denied this protest, and complainant, as the party aggrieved by such denial, filed the instant complaint in this court on October 27, 1953.
 
 
 33
 As above stated, the Court of Appeals for the Tenth Circuit has adjudged, in litigation between these same parties, that respondent's letter of October 18, 1946, was in effect an "order" under § 2 of the Emergency Price Control Act, from which it would follow, from the terms of the Act, that the Emergency Court of Appeals has exclusive jurisdiction to review the validity of such order. We need not now decide whether, on principles of res judicata, this prior judicial determination, which normally is conclusive as between the parties, would also preclude the Emergency Court of Appeals from inquiring sua sponte into its own jurisdiction to adjudicate the issues raised in the present complaint. For our own prior decisions have made clear that we have jurisdiction in a case of this sort. Merchants Packing Co. v. R. F. C., Em.App. 1949, 176 F.2d 908, 912; Belle City Packing Co. v. R. F. C., Em.App.1948, 169 F.2d 413, 414, and cases cited; Silver Pine Oil Co. v. R. F. C., Em.App. 1953, 205 F.2d 835, 836. Respondent has offered no suggestion that we are without jurisdiction to adjudicate the merits of the present complaint.
 
 
 34
 For the reasons already indicated in this opinion, a judgment will be entered setting aside respondent's letter-order of October 18, 1946, setting aside also respondent's order of October 1, 1953, which denied the protest, and remanding the case to respondent for further proceedings not inconsistent with this opinion.