CONSOLIDATED FLOUR MILLS CO. v. RECONSTRUCTION FINANCE CORPORATION.

HUNTER MILLING CO. v. RECONSTRUCTION FINANCE CORPORATION.

Nos. 502, 503.

United States Emergency Court of Appeals

Heard at Chicago Sept. 9, 1949.

Decided Oct. 19, 1949.

As Amended on Denial of Rehearing Nov. 8, 1949.

Mr. Glenn G. Paxton, Chicago, Ill., with whom Herbert J. Campbell and Edgar Vanneman, Jr., and Campbell, Clark & Miller, Chicago, Ill., were on the brief, for complainants.

Joseph M. Friedman, Special Assistant to the Attorney General, with whom E. Leo Backus, Attorney, Department of Justice, Washington, D. C., was on the brief, for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MARIS, Chief Judge.

These consolidated complaints attack the action of the respondent in disallowing in part complainants' claims for flour subsidy payments for certain periods in the year 1946.

The flour subsidy program was inaugurated on November 30, 1943 under Regulation No. 4[1] issued November 29, 1943 by Defense Supplies Corporation under authority of Section 2(e) of the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 902(e). The program was administered by Defense Supplies Corporation until July 1, 1945,[2] when that corporation was dissolved and its functions in this regard were assumed by the respondent. On February 28, 1946 the respondent issued Regulation No. 9 effective March 1, 1946, under which the flour subsidy program was administered thereafter until its expiration on June 30, 1946. Insofar as the questions involved in these suits are concerned Regulation No. 9 made no material change in the provisions of the preceding Regulation No. 4.

In order to understand the questions raised in these consolidated cases it is necessary to review briefly certain of the provisions of Regulation No. 9 relating to the payment of the flour subsidy. Under that regulation the subsidy was payable to each miller monthly in respect of the flour ground by him during the month, an application for the subsidy for all wheat ground by him during the month in all his mills being required to be filed during the next succeeding calendar month. Section 7009.5 of the regulation provided that the rates of subsidy and the periods during which such rates would be effective would be determined and announced from time to time by the respondent and that the rate of payment on account of wheat ground during a month should be the rate in effect during the month in which the wheat was ground. To this last provision, however, there was an exception in the case of applicants for subsidy who had unfilled orders for flour on their books at the beginning of the month. Paragraph (2) of subsection (b) of Section 7009.5 provided that in such a situation the rate of payment on account of wheat ground during the month up to the amount of such unfilled orders should be the rate or rates in effect at the time the flour produced from such wheat was sold. That paragraph further provided that in determining which sale of flour was applicable to wheat ground the respondent would apply the first in-first out principle and not follow individual transactions. In subparagraph (i) of paragraph (2) of subsection (b) appeared the provision which forms the basis of the controversy with which we are here concerned. That subparagraph provided that in determining the amount of sales of flour, the amount of contracts for the sale of flour which had been cancelled would be deducted from the sales of flour outstanding during the month in which the rate of subsidy was higher of either (1) the month in which the cancellation occurred, or (2) the month in which the sale was booked. The full text of subsection (b) of Section 7009.5 of Regulation No. 9 is set out in the footnote.[3]

1. 9 F.R. 1822.

2. See Act of June 30, 1945, 59 Stat. 310, 15 U.S.C.A. § 611 note.

3. "Section 7009.5 Rate of Payment.
   "(a) * * *
   "(b) Determination of Applicable Rate.

"(1) In General. Except as otherwise provided, the rate of payment on account of wheat ground during a month shall be the rate in effect during the month in which the wheat was ground.
   "(i) Election under Regulation 4. The election made by an applicant under Reg-

From December 1, 1945 to April 30, 1946 the flour subsidy rate fixed by the respondent was 31½ cents per bushel of wheat ground into flour. During the period from May 1, to May 24, 1946, the rate of 31½ cents per bushel was continued. For the period May 25 to May 31, 1946 the rate was increased to 39½ cents per bushel and for the month of June, 1946 the rate was again increased to 47 cents per bushel. In view of the change of subsidy rate in the latter part of May the periods May 1–24 and May 25–31 were treated by the respondent as separate months for subsidy purposes.

The two complainants are and during the entire subsidy program were engaged in the flour milling business in the State of Kansas. On May 1, 1946 each of them had large unfilled orders for flour on their books and the subsidy payable to them for the period May 1–24 was, therefore, determined under Section 7009.5(b) (2). During and prior to that period, however, each of the two complainants cancelled substantially all of their unfilled orders for flour so that they had only a comparatively small amount of unfilled orders remaining on hand at the beginning of the subsidy period May 25–31.[4] During that period The Hunter Milling Company ground out all these remaining unfilled orders as well as over 10,000 additional bushels of wheat and it, therefore, had none of these unfilled orders on hand on June 1. The Consolidated Flour Mills Co. did not grind out all these remaining unfilled orders in the period May 25–31, but did do so in June, and moreover ground over 160,000 additional bushels of wheat in that month. For the wheat thus ground by them during the periods May 25–31 and June, 1946, in excess of the unfilled orders on hand at the beginning of those periods the complainants claimed under Section 7009.5(b) (1) of Regulation No. 9 flour subsidy payments at the increased rates in effect during those periods, respectively. Their claims were denied by the respondent as to the excess of subsidy claimed over 31½ cents per bushel. This resulted in a reduction of the claim of The Consolidated Flour Mills Co. of approximately $25,000 and of the claim of The Hunter Milling Company of approximately $22,500. Both complainants filed protests with the respondent against these determinations and denials of subsidy. Their protests were denied and petitions for reconsideration thereof were dismissed. The complaints now before us were thereupon filed in this court and since they involve the same legal question were consolidated for hearing and decision.

The action of the respondent in reducing the complainants' claims and in denying their protests was based upon its ruling that the complainants were required to account for the wheat equivalent[5] presumably left on hand as a result of the cancellations of unfilled orders to which we have re-

---

ulation No. 4 to be paid at the rate in effect during the month in which the wheat was ground shall be equally binding on the applicant under this Regulation.

"(2) On Wheat Ground to Produce Flour Previously Sold. If the applicant has so elected and has unfilled orders for flour booked at the beginning of the month, the rate of payment on account of wheat ground during that month up to the amount of such unfilled orders for flour shall be the rate or rates in effect at the time the flour produced from such wheat was sold. In determining which sale of flour is applicable to wheat ground, Reconstruction Finance Corporation will apply the first in-first out principle and not follow individual transactions.

"(i) Cancelled Contracts for the Sale of Flour. In determining the amount of sales of flour, the amount of contracts for the sale of flour which have been cancelled on and after March 1, 1946, will be deducted from the sales of flour outstanding during the month in which the rate of subsidy under either this regulation, or Regulation No. 4, is higher of either (1) the month in which the cancellation occurred, or (2) the month in which the sale was booked."

4. The unfilled orders on hand uncancelled on May 25, 1946 were, in the case of The Consolidated Flour Mills Co., for 23,608 cwt. of flour, and, in the case of The Hunter Milling Company, for 185 cwt. of flour.

5. The record discloses that it is a practice in the industry for millers who make

ferred before they were entitled to receive subsidy payments at the higher rates. The respondent's position was that this was to be done by requiring that these cancelled orders, insofar as they could not be offset against new sales booked in the month of cancellation, should be carried forward into later subsidy periods as a "negative balance" of unfilled orders and should be offset against wheat ground into flour during those periods until the wheat equivalent of the "negative balance" of unfilled orders had been fully ground out, the old subsidy rate (in these cases 31½ cents per bushel) to apply to all wheat ground until the latter event had taken place. The complainants contend, on the other hand, that all they were required by the regulation to do was to deduct the cancelled sales contracts from those bookings, either of the month of cancellation or of the month of sale, which carried the higher subsidy rate and that where, as here, both months carried the same rate it was wholly immaterial from which month's bookings the cancellations were deducted. Accordingly they do not seriously oppose the application of the cancellations to the sales of the month of cancellation but they do strenuously argue that the excess of cancellations over sales in the month of cancellation should be deducted from the sales of the months in which the cancelled sales were booked and should not be carried forward as "negative balances" to be applied against future sales.

■ We think that the complainants' contentions in this respect are well founded and that the position of the respondent cannot be sustained. The latter as paying agent was bound to administer the subsidy regulation in accordance with its terms[6] and we find nothing in the language of the regulation which required the carrying forward of so-called "negative balances" of unfilled orders in the manner contended for.

The respondent's contention is based upon subparagraph (i) of paragraph (2) of Section 7009.5(b). That subparagraph, however, merely directed that cancelled contracts should be deducted from sales of the month of cancellation or the month of booking, whichever carried the higher subsidy rate. It was wholly silent as to the treatment of the excess of cancellations over bookings in the month of cancellation and we think the reason for this is plain from the structure of the regulation and its other provisions. Subparagraph (i) was placed in the regulation as subordinate to paragraph (2). The latter paragraph by its express terms applied only to a miller who had unfilled orders on hand at the beginning of the subsidy month and it provided, as we have seen, that wheat ground during the month up to the amount of such unfilled orders should be subsidized at the rate in effect at the time of sale and that in determining which of the unfilled orders on hand should be applicable to the wheat ground, the first in-first out principle should be applied and the actual orders applicable to the wheat ground should be disregarded. It is apparent that subparagraph (i) upon which the respondent relies was intended to set up an exception to the first in-first out principle of paragraph (2). Instead of treating cancellations as applicable to the earliest unfilled contracts on the books, which the first in-first out principle would require, it directed that they be applied to the new bookings of the month of cancellation if the subsidy rate was higher in that month than in the earlier month in which the cancelled sale itself was booked.

■ It necessarily follows, we think, from the language and arrangement of the regulation that subparagraph (i) could have application in a particular subsidy period only to the unfilled orders for flour which were actually on the miller's books at the beginning of that period and to those taken during the period. This follows from the

---

sales of flour for future delivery to hedge those contracts by making equivalent contracts for the purchase of the necessary wheat.

6. Earl C. Gibbs, Inc., v. Reconstruction Finance Corp., Em.App.1948, 169 F.2d 654.

fact that paragraph (2) of Section 7009.5(b), to which subparagraph (i) was subordinate, itself applied only to unfilled orders for flour booked at the beginning of the subsidy month in question. The respondent contends that the phrase "unfilled orders for flour booked at the beginning of the month," as here used in the regulation, was intended to include orders theretofore legally cancelled but which were to be regarded as unfilled for subsidy purposes. We find no merit in this contention. Therefore to the extent that a miller ground out flour in any subsidy period in excess of his legally subsisting unfilled orders at the beginning of the period he was entitled to subsidy thereon under paragraph (1) of Section 7009.5(b) which expressly provided that the subsidy rate to which he was entitled should be the rate in effect during the month in which the wheat was ground.

It follows that subparagraph (i) was applicable to the complainants only in those subsidy periods prior to May 25, 1946 in which the cancellation of contracts by them actually took place. Those contracts having been legally cancelled prior to May 25, 1946, as the respondent concedes, they could not have been unfilled orders for flour which were on the complainants' books on that date within the meaning of paragraph (2) of Section 7009.5(b) and consequently they could not have been subject thereafter to the operation of subparagraph (i).

■ We think that the complainants' contentions may well be sustained upon another ground. Subparagraph (i) would seem to be applicable, in the sense that it would affect the rates of subsidy payable, only to those cancelled contracts for the sale of flour in which it appeared that the rate of subsidy effective in the month of cancellation was different from the rate in effect for the month in which the sales were booked. In the cases now before us,

however, the rate of subsidy was admittedly the same in both months. Consequently it would appear that subparagraph (i) had no practical application to the complainants' situation. If that be so, the first in-first out principle of paragraph (2) would have been applicable instead and the whole basis of respondent's contention would be eliminated from the cases.

■ The respondent strongly urges that the construction of the regulation for which the complainants contend violates its spirit and may enable the complainants to secure a windfall if the fact is that they had hedged the cancelled contracts with equivalent contracts for the purchase of wheat. There is no evidence, however, that this was the case and in any event we are bound, as is the respondent, to construe the regulation in accordance with its plain meaning.[7] We find nothing whatever therein which would require millers to hedge their forward sales of flour with equivalent purchases of wheat. If such was the intention of the framers of the regulation they have wholly failed to incorporate it therein.

We conclude, therefore, that for the wheat ground by the complainants during the periods May 25–31 and June, 1946 in excess of the unfilled orders actually on hand and uncancelled at the beginnings of those periods, respectively, the complainants were entitled to be paid the flour subsidy at the rates in effect for those periods, 39½ cents and 47 cents per bushel, respectively.

Judgments will be entered setting aside the denial of the protests of the complainants by the letters of the Reconstruction Finance Corporation dated December 22, 1947, and remanding the causes to the Reconstruction Finance Corporation for further proceedings not inconsistent with the opinion of this court.

7. Crooks v. Harrelson, 1930, 282 U.S. 55, 60, 51 S.Ct. 49, 75 L.Ed. 156; Kent v. Rothensies, 3 Cir., 1941, 120 F.2d 476, 479.