179 F.2d 965
 FLOUR MILLS OF AMERICA, Inc.
v.
RECONSTRUCTION FINANCE CORPORATION et al.
 No. 512.
 United States Emergency Court of Appeals.
 Heard at Washington September 26, 1949.
 Decided February 6, 1950.
 
 Temple W. Seay, Washington, D. C., with whom Phil D. Morelock, Washington, D. C. and Joseph A. Hoskins, Kansas City, Mo., were on the brief, for complainant.
 E. Leo Backus, Attorney, Department of Justice, Washington, D. C., with whom Joseph M. Friedman, Special Assistant to the Attorney General, was on the brief, for respondents.
 Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
 MAGRUDER, Judge.
 
 
 1
 This case has to do with a claim of Flour Mills of America, Inc., to certain additional subsidy payments under Regulation 4 — Flour Production Payments, issued by Defense Supplies Corporation November 29, 1943, effective the next day. (9 F. R. 1822) The subsidy regulation was issued under authority of § 2(e) of the Emergency Price Control Act of 1942, 56 Stat. 26, 50 U.S. C.A.Appendix, § 902(e), and the program was administered by DSC until July 1, 1945, when that corporation was dissolved and its functions and liabilities transferred to respondent Reconstruction Finance Corporation. 59 Stat. 310.
 
 
 2
 Under Regulation 4, the subsidy was payable to each miller monthly in respect of the flour ground by him in all of his mills during the month, an application for the subsidy being required to be filed during the next succeeding calendar month. (§§ 7004.2 and 7004.3) Section 7004.3(c) provided: "One and only one application can be filed on account of wheat ground during a month by an applicant in all of his mills." Section 7004.5 provided that there "shall be separate rates on hard wheat, on soft wheat and on durum wheat ground into flour by mills outside the Pacific Coast area." The section also provided that the rates of subsidy and the periods during which such rates would be effective would be determined and announced by the respondent from time to time, and that except as otherwise provided, "the rates of payment on account of wheat ground during a month shall be the rates in effect during the month in which the wheat was ground." This general formula was subject to a specific exception in the case of applicants for subsidies who had unfilled orders for flour on their books at the beginning of the month. As explained by respondent in its denial of the protest: "It was the basic principle of the flour subsidy that it should be paid on the grind only at rates in effect when the flour was sold. It was the general practice of the industry to buy wheat as a hedge when the flour was sold, and the subsidy was to cover the milling operations and not the speculative operations of millers. The forward sales practice of the industry necessitated the calculation of subsidy payments on flour ground at rates determined by the subsidies in effect at the time the forward sales were booked." Accordingly, paragraph (2) of subsection (c) of § 7004.5 read as follows: "(2) On wheat ground to produce flour previously sold. If the applicant has registered forward sales of flour in accordance with § 7004.7 of this regulation, and has forward sales of flour booked at the beginning of the month, the rate of payment on account of wheat ground during that month up to the amount of such forward sales of flour shall be the rate or rates in effect at the time the flour produced from such wheat was sold. In determining which sale of flour is applicable to wheat ground, Defense Supplies Corporation will apply the first-in-first-out principle and not follow individual transactions, either as to dates of delivery or types of wheat necessary to produce the flour."
 
 
 3
 In § 7004.6(d) it was provided: "No payment will be made on the wheat ground into flour on and after December 1, 1943, and prior to the date of termination of this regulation, to produce the amount of the net forward sales of flour, made by the applicant and unfilled at the close of business on November 30, 1943, and registered with Defense Supplies Corporation in accordance with § 7004.7 below."[1]
 
 
 4
 Every applicant was required by § 7004.7 to register with DSC before filing his first application for payment, and further it was provided that registration "shall be by each applicant, not by each mill, and shall include a report of total net forward sales of flour unfilled at the close of business on November 30, 1943".
 
 
 5
 During the period in question, complainant was engaged in the flour milling business at Kansas City, Missouri, and as such was eligible for flour subsidy payments under the regulation. When the regulation was issued complainant, pursuant to § 7004.7, registered with DSC as an applicant for subsidies, and reported its net forward sales of flour unfilled at the close of business on November 30, 1943, in a total of 1,218,320 cwt. of flour, composed of 931,683 cwt. of hard wheat flour and 286,637 cwt. of soft wheat flour.
 
 
 6
 Applications were duly filed for subsidy payments for each monthly grind for the periods December, 1943, to December, 1944, inclusive; and in payment thereof complainant received from DSC the aggregate sum of $2,165,448.91. Applying §§ 7004.5 (c) (2) and 7004.6(d), DSC computed the amounts of subsidy payments due by eliminating from consideration for subsidy purposes, on a first-in-first-out basis, an amount of wheat ground by complainant after November 30, 1943, equivalent to its net forward sales of flour unfilled as of that date; that is, complainant's first grind of wheat after November 30, 1943, was applied to its net forward sales, and not considered for subsidy purposes. In this connection, no distinction was made between the types of wheat ground after November 30, 1943, but the aggregate of the grind after that date, whether of soft or hard wheat, was applied against the total of the unfilled net forward sales as of November 30, 1943, regardless of type. Similarly, in auditing complainant's claims for the succeeding months, DSC made no distinction between the types of wheat ground as applied, on a first-in-first-out basis, to the net forward sales on the books at the beginning of the accounting period. This was the procedure followed, although from the outset of the subsidy program up to October 10, 1944, the rates of subsidy for grinding hard wheat into flour, as announced from time to time, were higher than rates of subsidy for grinding soft wheat.
 
 
 7
 On March 8, 1945, complainant filed with DSC corrected amended claims for payment of an additional subsidy of $49,362.31 for the period December 1, 1943, to December 31, 1944, inclusive. Complainant's basic objection was that it had been required to file its subsidy claims as a multiple unit for all of its mills, lumping both hard and soft wheat together, instead of as separate units, including its hard wheat mills in one unit and its soft wheat mills in another; that if the latter procedure had been prescribed, the correct application of complainant's monthly grind to forward sales by types of wheat would have been possible, as in the case of millers grinding only one type of wheat, that is, either soft or hard. In its letter accompanying the amended claims complainant stated: "May we point out that had the types of flour sold, and the types of wheat ground out been reported separately and the subsidy so computed for claim purposes as they are reported in these amended claims, we would have been reimbursed for the full amount claimed herein. The soft wheat mill operates exclusively on soft wheat and likewise the hard wheat mill or mills operate exclusively on hard wheat."
 
 
 8
 Complainant's amended claim was rejected by respondent, and eventually, on April 1, 1949, complainant filed its formal protest against the regulation, and the order or determination of respondent thereunder denying complainant's amended claim for an additional subsidy of $49,362.31.
 
 
 9
 The protest asserted that the regulation, as applied by respondent, was "inequitable and discriminatory as between subsidy claimants who are exclusively millers of hard wheat and the company which operates several mills or units at which both hard and soft wheat are ground", and that this discrimination arose by reason of respondent's requirement that the claimant must file its subsidy claims as a multiple unit for all of its mills, incorporating both soft and hard wheat together. It was stated that the inequity arose at the outset of the subsidy program when the hard and soft wheat forward sales position was to be ground out on a first-in-first-out basis without regard to the fact that the hard wheat flour and soft wheat flour thus ground and excluded from subsidy were not in the same proportion as the hard and soft wheat flour forward sales which governed the exclusion from the subsidy. Since the net forward sales of soft wheat flour of complainant aggregated 286,637 cwt. on November 30, 1943, the actual grind of soft wheat milled after November 30, 1943, to the extent of 286,637 cwt., should have been applied against the net forward sales of soft wheat flour for elimination from subsidy consideration; and similarly, since net forward sales of hard wheat flour aggregated 931,683 cwt. on November 30, 1943, the actual grind of hard wheat flour after that date, to the extent of 931,683 cwt., should have been applied against the net forward sales of hard wheat flour for elimination from subsidy consideration. But, having ground out a disproportionate amount of hard wheat after November 30, 1943, as compared with the proportion of hard wheat flour included in its net forward sales of flour on its books at the close of business November 30, 1943, complainant was compelled, under the regulation as construed by RFC, to apply the bushel equivalent of 128,503 cwt. of hard wheat flour in excess of forward sales of hard wheat flour in cancellation of forward sales of soft wheat flour, and, in consequence, was penalized to the extent of the difference between the hard wheat subsidy rate and the lower soft wheat subsidy rate. Finally, the protest alleged that, had complainant ground only hard wheat, its subsidy payments under the regulation would have aggregated $2,065,993.01; whereas had it ground only soft wheat, its subsidy payments would have aggregated $148,818.21. "Thus the payments due on account of the separate milling operations or which would have been paid to two separate millers engaged in hard wheat milling on the one hand and soft wheat milling on the other, would have aggregated $2,214,811.22 as opposed to $2,165,448.91 received by the company, or a difference of $49,362.31."
 
 
 10
 By letter dated May 24, 1949, respondent denied the protest. It was stated that respondent had not undertaken to verify the amount of the claim, but rested its denial on the ground that the underlying concept upon which the amended claim was based was untenable.
 
 
 11
 In so far as the protest was based upon the interpretation of the regulation, we think it was clearly unfounded. Complainant was not permitted under the regulation to do what it would have liked to do, namely, to file its claims as though it were two millers, one grinding hard wheat exclusively and the other grinding exclusively soft wheat. Under the scheme of the regulation it was treated as a multiple unit and allowed to file only one application on account of wheat ground in all of its mills during the month. Though § 7004.5(2) provided that there should be separate subsidy rates on hard and soft wheat, and § 7004.5(c) (1) stated the general formula that rates of payment on account of wheat ground during a month should be the rates in effect during the month in which the wheat was ground, the regulation must be read in its entirety, and these provisions were subject to an important qualification in cases where the applicant for subsidies had unfilled orders for flour on its books at the beginning of the month, a situation dealt with specifically in § 7004.5(c) (2). The latter subsection, after providing that the rate of payment on account of wheat ground during the monthly accounting period up to the amount of such forward sales of flour "shall be the rate or rates in effect at the time the flour produced from such wheat was sold", concluded with this rule of thumb: "In determining which sale of flour is applicable to wheat ground, Defense Supplies Corporation will apply the first-in-first-out principle and not follow individual transactions, either as to dates of delivery or types of wheat necessary to produce the flour." [Italics added.] This seems to us unambiguously to mean, what respondent from the outset and consistently thereafter took it to mean, and indeed what complainant apparently took it to mean when it filed its original claims, namely, that the applicant's total grind of wheat during the monthly accounting period, without regard to types of wheat ground, whether hard, soft, or durum wheat, would be applied on the first-in-first-out principle against the forward sales of flour on the books and unfilled at the beginning of the accounting period. Respondent points out, and we think it is significant, that no other miller engaged in grinding two or more types of wheat has challenged this interpretation of the regulation, and settlements of subsidy claims have uniformly been made on this basis. Even if there were conceded to be some ambiguity in the text of the regulation, we would be inclined to adopt a not unreasonable interpretation of the language consistently adhered to by the administrative agency which issued the regulation and had the duty of administering it.
 
 
 12
 In our review of these subsidy cases, we have several times set aside an order or determination of RFC denying a subsidy claim, where we found that the order was "contrary to law", because not in accordance with the terms of the regulation, properly interpreted. Maloney Packing Co. v. R.F.C., Em.App.1947, 159 F.2d 717; Belle City Packing Co. v. R.F.C., Em.App. 1948, 169 F.2d 413; Earl C. Gibbs, Inc., v. R.F.C., Em.App. 1948, 169 F.2d 654; Wm. Schluderberg-T. J. Kurdle Co. v. R. F. C., Em.App. 1948, 169 F.2d 658; Royal Packing Co. v. R.F.C., Em.App. 1948, 169 F.2d 999; Consolidated Flour Mills Co. v. R.F. C., Em.App. 1949, 177 F.2d 206. For the reasons already stated, we think the present is not such a case.
 
 
 13
 Assuming as we do that respondent here followed the terms of the regulation in denying complainant's amended subsidy claims, there remains to be considered whether we are warranted in setting aside some provision of the regulation itself as being "not in accordance with law" or "arbitrary or capricious". Complainant has already collected over $2,000,000 of subsidy under Regulation 4; and it contends, in effect, that if the regulation had been worded differently and in its view more reasonably, it would have received an additional subsidy amounting to not much over two per cent of the total subsidies respondent has paid it. It is not the function of this court to formulate the subsidy program or to rewrite the subsidy regulation. So far, we have never had occasion to set aside a provision of a subsidy regulation. It is true, we said by way of dictum in Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em. App. 1946, 155 F.2d 525, 531, certiorari denied 1946, 329 U.S. 737, 67 S.Ct. 51, 91 L.Ed. 637: "If a price regulation prescribed a maximum price for a commodity as applicable generally to a particular class of sellers, and then without any rational basis of differentiation prescribed a lower maximum price as applicable to an individual member or small group of that class, the latter provision would constitute an arbitrary and capricious discrimination. The same type of discrimination may be created in the establishment of subsidies as part of the price control program, as where, in lieu of a higher level of maximum prices, a subsidy is provided for a particular class of sellers, but a provision of the subsidy regulation arbitrarily excludes a member of the class from participation in the subsidy. Whether such discrimination is brought about in the price regulation itself or in an interrelated subsidy regulation, in either case this court has jurisdiction to set aside the discriminatory provision as being arbitrary and capricious."
 
 
 14
 But in view of the very wide discretion conferred upon the administrative agencies charged with authority to promulgate a program of government subsidies, the case would necessarily be a rare one in which we would be warranted in setting aside a term of such a regulation as being "arbitrary or capricious". Certainly, Regulation 4 as drafted was not obviously intended to discriminate against companies operating multiple mills and grinding various types of wheat in favor of millers who grind only one type of wheat; and looking at the matter prospectively, the regulation would not necessarily operate to the disadvantage of a miller, such as complainant, engaged in combined milling operations. The proportions of hard and soft wheat ground by complainant lay in its control, and its present complaint arose because it chose to grind out hard wheat flour in considerably greater proportion than its net forward sales warranted. The contrary might have happened, and complainant might have had forward sales of hard wheat flour canceled by subsequent production of soft wheat flour. Prospectively, while there was a chance that the regulation would operate advantageously or disadvantageously to a miller engaged in grinding both types of wheat, if its grind immediately subsequent to November 30, 1943, were not timed to coincide more or less as to type of wheat with its unfilled forward bookings, it would have seemed likely that on the whole the average miller's subsidy account would be in substantial balance.[2]
 
 
 15
 Respondent urges that the simple rule of thumb contained in § 7004.5(c) (2) was justified by various considerations of administrative convenience; and that the regulation as written tended to minimize the possibility for manipulation and speculation. We may agree with complainant that respondent has tended to overstress the weight of these factors in supporting the regulation as written. Still, we could not say that the provision of the regulation objected to was "arbitrary or capricious" merely because it now appears, ex post facto, that due to fortuitous circumstances the regulation happened to operate somewhat to the disadvantage of one miller, discrimination not being inherent in the terms of the regulation.
 
 
 16
 A judgment will be entered dismissing the complaint.
 
 
 
 Notes:
 
 
 [1]
 This provision is really implicit in § 7004.5(c) (2) quoted above. Wheat ground after December 1, 1943, to produce the amount of net forward sales of flour on the books November 30, 1943, would be paid a subsidy at the rates in effect at the dates of such forward sales — which would be zero, since there was no subsidy prior to December 1, 1943
 
 
 [2]
 The respondent points out that under the regulation as applied, the "hardship" which complainant incurred could be a substantial one only at the inception of the flour subsidy program, when net forward sales as of November 30, 1943, were to be completely offset by subsequent grind, prior to commencement of any subsidy payment. As stated in respondent's brief: "Once the program got under way, however, and the miller had worked off his pre-subsidy bookings, there was no possibility whereby the procedure adopted could work to the disadvantage of anyone, including combined millers. Thus, where in a particular month, a miller ground out soft wheat, and was paid at the soft wheat rates, and pursuant to the first-in-first-out rules, such grind was applied to offset forward sales of hard wheat, carrying a higher rate, said miller in the following month, would grind out hard wheat for which he would be paid hard wheat rates, and under the mentioned first-in-first-out rule, said hard wheat grind would have been used to offset his soft wheat forward sales. In other words, the subsidy account ultimately would balance out and the miller eventually would come out whole. To reiterate, once the initial transactions relating to the pre-subsidy forward sales had been disposed of, the procedure adopted herein allowed for complete balance of the accounts of the combined miller."