## RECONSTRUCTION FINANCE CORP. v. STANOLIND PIPE LINE CO.

### Civ. A. No. 4142.

United States District Court
W. D. Oklahoma.

Feb. 14, 1951.

D. A. Richardson, of Richardson, Shartel & Cochran, Oklahoma City, Okl., for plaintiff.

Ray S. Fellows, of Fellows & Fellows, Cecil Hunt and T. W. Arrington, of Tulsa, Okl., for defendant.

VAUGHT, Chief Judge.

The plaintiff seeks to recover the sum of $134,252, covering alleged illegal claims for subsidies from August, 1944, to July, 1946, and to have held invalid the counterclaim of the defendant in the sum of $5,237 for subsidies from July, 1946 to November, 1946. This action is brought pursuant to a Directive issued June 28, 1944, by the Honorable Fred N. Vinson, Director of the Office of Economic Stabilization, which provided that the Price Administrator should increase the existing prices of crude oil produced from marginal oil fields and that the Secretary of Commerce should cause one of the corporations organized pursuant to Section 5(d) of the Reconstruction Finance Corporation Act, as amended, 15 U.S.C.A. §§ 604, 606b, to exercise its authority to pay subsidies to reimburse purchasers for amounts expended for crude oil, the maximum price for which was increased pursuant to said Directive, in excess of the amounts that such purchasers would have been permitted to pay on the basis of maximum prices as they existed prior to the increases authorized by the Directive.

Stanolind Pipe Line Company, defendant herein, is a corporation engaged in the transportation of crude oil and other petroleum products through its pipe line facilities. From August 1, 1944 through November, 1946, the defendant transported and had in its pipe lines crude oil in the amount of 242,645,976 barrels. During said period the defendant purchased, from the Continental Oil Company, 435,977 barrels of oil produced from its stripper wells in Montague County, Texas, on which subsidies were allowed under the above-named Directive. During said period the defendant transported through its pipe line 4,694,376 barrels of subsidy oil for the Stanolind Oil Purchasing Company, and 10,210,172 barrels of subsidy oil for Standard Oil Company of Indiana, making a total of 15,340,525 barrels of subsidy oil received in the pipe line for all purposes. All of this oil was received in the pipe line for trans-

portation to connecting carriers or to refineries, and of the total amount, 46,264,066 barrels were delivered to connecting carriers and 196,381,910 barrels to refineries. In transporting the oil it was necessary for the defendant at various stations along the line to operate its pumps for the purpose of forcing the oil through the pipe line. It was the custom of this defendant to use crude oil from the pipe line as fuel at its various pumping stations and then to purchase oil to replace the oil taken for fuel, so that the pipe line company could deliver either to the connecting carrier or to the refinery the same amount of oil which it received for that purpose at the beginning of the transportation service. During this period 1,215,088 barrels of oil were taken from the pipe line for fuel in operation of the pumps.

It is the contention of the plaintiff (and the entire action is based upon that one proposition), that the 435,977 barrels of subsidy oil purchased by the defendant from the Continental Oil Company from the stripper wells were used for fuel, and therefore the producer was not entitled to the subsidy provided for in the Directive. Notwithstanding the fact that other subsidy oil went into the pipe line in the amount of 14,904,548 barrels, no contention was made by the plaintiff that any of this oil was used for fuel.

The total fuel oil used represents approximately one half of one per cent. of the oil transported in the pipe line and the subsidy oil, (435,977 barrels) produced by Continental, represents one fifth of one per cent. of the oil transported. In other words for every barrel of subsidy oil in the pipe line, there were sixteen barrels of nonsubsidy oil, and for every barrel of the 435,977 barrels of subsidy oil produced by Continental there were 556 barrels of nonsubsidy oil.

█ The plaintiff vigorously contends that the oil in the pipe line was a fungible commodity and is governed by the law pertaining to fungible goods or commodities. It also argues that the contention of the defendant, that the plaintiff was charged with knowledge of the custom of the pipe line companies to take oil from the lines

for fuel in the operation of their pumping stations and replace it with purchased oil, has nothing to do with the case. The plaintiff is clearly in error in both of these contentions for the authorities cited concerning the law pertaining to fungible goods or commodities do not apply to the situation here. The clear purpose of the Directive was to obtain the oil from stripper wells that would otherwise be lost to the war effort. This it undoubtedly sought to accomplish without disturbing the usages and customs of the pipe line operators in moving the oil. Therefore if the primary purpose of obtaining the oil from the stripper wells was accomplished, it would be wholly immaterial as to the use to which the stripper well oil was employed in the general war effort. And certainly where nothing to the contrary is shown, the custom pertaining to the mode of transportation by the pipe line operators becomes an important factor, and after having apparently recognized that custom by paying the claims based thereon from August 1, 1944 through November, 1946, in the amount of $134,252, the plaintiff should not now be heard to say such custom should not be taken into consideration.

It was not only the custom of the defendant to utilize oil in the pipe line to operate its pumping stations but it was the custom of other pipe lines operating in the same territory, including the Service Pipe Line Company, Continental Pipe Line Company, Sinclair Refining Company and the Texas Pipe Line Company.

Under the record it is apparent that for every barrel of oil accepted for transportation a barrel was delivered either to the refinery or to the connecting carrier less one and one half per cent. the amount which by custom was deducted for leakage, evaporation, et cetera.

The plaintiff contends that a proper construction of the Directive would prohibit the paying of the subsidy on the oil from the stripper wells if any portion thereof was used for fuel. It is admitted that when the subsidy oil goes into the pipe line it is immediately so commingled with other oil in the pipe line that its identity is lost and it could not be distinguished in any manner from the other oil, and if the proportionate part of this oil were used for fuel, only 2185 barrels of the subsidy oil involved in this case could be said to have been used as fuel oil, that is, 2185 of 1,215,088 barrels.

One and one half per cent. of 435,977 barrels would be 6539 barrels. If therefore the pipe line was permitted to deduct one and one half per cent. for leakage, waste, evaporation, et cetera, this one and one half per cent. would be almost three times the sum of 2185 barrels which would be the proportionate part of the Continental subsidy oil. The defendant contends that there is no provision in the Directive relative to the purpose for which stripper oil might be utilized, and an examination discloses that the Directive is silent as to the use of oil from stripper wells. It is the contention of the plaintiff that MPR 88 and MPR 436 are controlling. Originally the prices of both crude oil and petroleum products were prescribed by the Price Administrator in a regulation entitled Maximum Price Regulation No. 88, referred to as MPR 88. In August, 1943, O. P. A. removed the pricing of crude oil from MPR 88 and placed it under a new regulation entitled Maximum Price Regulation No. 436, referred to as MPR 436. The Directive, however, states: "Whereas, as Director of Economic Stabilization, I find it necessary to insure the maximum necessary production and distribution of crude oil, to maintain ceiling prices, to prevent a price rise inconsistent with the purposes of Executive Orders Nos. 9250 and 9328, and to aid in the effective prosecution of the war; now therefore," et cetera.

Executive Order No. 9250, dated October 3, 1942, 50 U.S.C.A.Appendix, § 901 note, provides explicitly for the establishment of the Office of Economic Stabilization with an advisory board; that the Director of the Office of Economic Stabilization, with the approval of the President shall "formulate and develop a comprehensive national economic policy relating to the control of civilian purchasing power, prices, rents, wages, salaries, profits, rationing, subsidies, and all related matters"; and that "The Director may perform the functions and duties, and exercise the

powers, authority, and discretion conferred upon him by this Order through such officials or agencies, and in such manner, as he may determine. The decision of the Director as to such delegation and the manner of exercise thereof shall be final."

Executive Order No. 9328, issued April 8, 1943, 50 U.S.C.A.Appendix, § 601 note, provides: "Except insofar as they are inconsistent with this order, Executive Order 9250 and the regulations issued pursuant thereto shall remain in full force and effect."

Thus the Director of the Office of Economic Stabilization is limited solely by the two Executive Orders Nos. 9250 and 9328 and is not affected by any other orders or MPR 88 and MPR 436.

Another proposition worthy of consideration is that there is no contention that the defendant did not deliver the amount of oil which it agreed to deliver either to the connecting carriers or to the refineries. If it used any of the contents of the pipe line for fuel, it purchased oil to replace the oil so used.

Pumping stations are as much a part of the pipe line system as the pipe line itself. The line of pipe would be useless without the pumps; the pumps would be useless unless operated; and the operation of the pumps requires fuel. Therefore, fuel to operate the pumps is incidental to the transportation of oil by pipe line, and since fuel is necessary to operate the pipe line, this court is of the opinion that such use would not be utilizing oil for fuel when used merely to transport oil for delivery to connecting carriers or to refineries.

The plaintiff assumes the burden of proof and therefore must prove by competent evidence, and by a preponderance thereof, that the subsidy oil purchased by the defendant from Continental was used for fuel. This the plaintiff has not done.

The relief sought by the plaintiff will be denied and the defendant, on its counterclaim, is entitled to judgment in the amount of $5,237, together with interest.

Findings of fact, conclusions of law and a form of judgment, consistent with this opinion, may be submitted within fifteen days from this date.