196 F.2d 730
 BORELLI
v.
RECONSTRUCTION FINANCE CORP.
 No. 578.
 United States Emergency Court of Appeals.
 Heard at Washington, D. C., December 15, 1951.
 Filed April 10, 1952.
 
 Alexander Boskoff, Washington, D. C., for complainant.
 Maurice S. Meyer, Atty., Department of Justice, Washington, D. C., with whom J. Gregory Bruce, Atty., Department of Justice, Washington, D. C., was on the brief, for the respondent.
 Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
 McALLISTER, Judge.
 
 
 1
 Frank Borelli, doing business as the Gilroy Meat Company, filed his complaint pursuant to the Emergency Price Control Act of 1942, as amended,[1] seeking to set aside the determination of respondent Reconstruction Finance Corporation, that he was not entitled to special subsidy payments as a non-processing slaughterer of beef.
 
 
 2
 Prior to July, 1943, complainant had purchased a slaughterhouse in Gilroy, California, and from that date throughout the meat subsidy program, operated this slaughterhouse as the Gilroy Meat Company. During this same period, Borelli was also the owner of the "Public Drive-In Market," a retail meat market located in Hollister, California. As the Gilroy Meat Company, he sold to the Public Drive-In Market — that is, to himself — a certain amount of the beef produced in his slaughtering establishment.
 
 
 3
 The controlling regulation[2] provided that extra compensation was, under certain conditions, to be paid during the period here in question to all non-processing slaughterers, as that term was defined by the regulation.
 
 
 4
 In order to be eligible for such extra compensation, a slaughterer, according to the regulation, must have been an "unaffiliated slaughterer[3] * * * who during six consecutive months of 1942, sold, and who currently sells, 98% or more, measured in dressed carcass weight, of the total beef produced from cattle slaughtered by him in all his establishments, in the form of carcasses, wholesale cuts, boneless beef or ground beef."[4] An unaffiliated slaughterer, according to the regulation, meant "a slaughterer who does not own or control a processor or purveyor of meat."[5]
 
 
 5
 The regulation further provided for the manner of filing claims by persons eligible to receive such extra compensation and the amount of payment to which they would be entitled.[6] A directive, or regulation, here applicable, further provided that "Slaughterers who during the year 1942 or a representative portion thereof sold and who currently sell 98% or more of the total dressed carcass weight of cattle slaughtered by them in the form of carcasses, wholesale cuts, frozen boneless beef * * * or ground beef shall be paid in addition to the payments authorized by Regulation No. 3 of Defense Supplies Corporation * * *, the amount of 0.80 per cwt. of cattle slaughtered during the month for which the payments are made."
 
 
 6
 These regulations established the criteria of eligibility applicable to the base period and to the subsidy period. Under the criteria applicable to the 1942 base period, unaffiliated slaughterers who had sold 98% or more of their beef in the four prescribed forms were eligible non-processors.
 
 
 7
 Under the criteria applicable to the subsidy period, slaughterers who sold 98% or more of their beef in the prescribed forms were entitled to extra compensation for the months during which they were unaffiliated.
 
 
 8
 Respondent, Reconstruction Finance Corporation, accepts the 1942 operations of complainant, while he was doing business as the Hollister Meat Company, as the base for computing eligibility of the Gilroy Meat Company during that period, although complainant later sold the Hollister plant; subsequently bought a plant at Gonzales, California, thereafter sold that plant, and afterward purchased the Gilroy plant, all of which he operated, at various times, during the subsidy period, and upon which operations he claims the extra compensation provided by the regulation.
 
 
 9
 When complainant filed his application for eligibility for the additional payments above provided, respondent informed him that he was not eligible for such extra compensation on account of his ownership of the retail meat market, presumably because such ownership made him an affiliated rather than an unaffiliated slaughterer; and no affiliated slaughterers were eligible to receive the extra compensation.[7]
 
 
 10
 On being informed of this disqualification, complainant sold his retail meat market. He subsequently resubmitted his application for extra compensation, which was again denied on the ground that more than 2% of complainant's wholesale sales of beef were made to his "affiliated retail market;" that in order to entitle an applicant to extra compensation, sales in all such cases must have been sales to strangers and could not include transfers or sales from one affiliate to another; that, therefore, complainant's actual wholesale sales in 1942 were less than 98% of his beef production; and that, accordingly, under the governing directive, or regulation, heretofore referred to, complainant was not eligible for the subsidy claimed.
 
 
 11
 Complainant contends that the proper interpretation of the regulation in question is that, as an "affiliated slaughterer," he would not be entitled to the extra compensation provided by the subsidy regulation, but that when he sold his retail meat market, his so-called affiliation came to an end; that, although the affiliation had existed in 1942 on the part of complainant because of his ownership of the slaughtering establishment and the retail meat market, nevertheless, as an applicant basically eligible because of his non-processing operations during that year, he could and did qualify himself for future payments of extra compensation by ridding himself of the affiliation. Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App.1946, 155 F.2d 525, certiorari denied 329 U.S. 737, 67 S.Ct. 51, 91 L.Ed. 637; Illinois Packing Co. v. Henderson, Em.App.1946, 156 F.2d 1000, certiorari denied 329 U.S. 783, 67 S.Ct. 202, 91 L. Ed. 671. In other words, complainant submits that his "affiliation" affected only current eligibility and not basic eligibility to receive the payments; that although he was affiliated during the base period, he could become currently eligible by ending his affiliation; and that the only basic requirement for eligibility was that the slaughterer must have sold at least 98% of his beef in the four different approved forms. Earl C. Gibbs, Inc., v. Defense Supplies Corporation, supra; Illinois Packing Co. v. Henderson, supra.
 
 
 12
 It appears from the foregoing authorities that affiliation only affects current eligibility; and upon divestiture of such affiliation, a non-processing slaughterer becomes eligible for the extra subsidy. This conclusion is strengthened by the fact that the regulation relating to affiliation is in the present tense — "a slaughterer who does not own or control a processor or purveyor of meat, and who is not owned or controlled by a processor or purveyor of meat." In no manner does the regulation relate back to the base period. It was obviously because of the language of the regulation that the agent of the Defense Supplies Corporation in California, in charge of the matter in question, advised the Washington Office, as more fully appears hereafter, that if complainant's operation of the Hollister Meat Company in 1942 was to be accepted as equivalent to the operation of the Gilroy Meat Company by complainant during that period, it would appear that complainant was entitled to the extra compensation from the date of sale of his retail meat market. Furthermore, Form No. 84, the form provided by the Defense Supplies Corporation, which was entitled "STATEMENT ESTABLISHING ELIGIBILITY FOR EXTRA COMPENSATION * * *" required the furnishing of data for two periods — the base period, and the current period. For the base period of 1942, an applicant was required to disclose the number of cattle which he had slaughtered during various periods of that year; the number of pounds of meat which he sold at wholesale; and the form in which such sales were made. All of this data relating to the base period, was concerned only with past operations. The information required in Form No. 84 for the current period was that the applicant furnish a list of partnerships in which he "now owns or controls directly or indirectly an equity, and all corporations in which the applicant now owns or controls directly or indirectly 10% or more of any class of outstanding stock." It was also required that, under the current ownership data, the applicant list all persons "who now own 10% or more of any class of outstanding stock of the applicant, or all persons who now own a partnership equity in the applicant." All of this data was for the present, or current operations. The foregoing would seem to indicate that the only information in which the agency was interested with regard to "affiliation" was current affiliation, in so far as it related to current eligibility. As was said by this court in Belle City Packing Co. v. Reconstruction Finance Corporation, Em.App. 1948, 169 F.2d 413, 416, "Presumably the form represented the subsidy-paying agency's interpretation of the eligibility requirements of the regulation." We are of the view that the foregoing discloses that it was intended by the Defense Supplies Corporation that current eligibility should depend upon current affiliation; and that when such current affiliation was discontinued, the applicant would be entitled to the extra subsidy, if he had been eligible during the base period.
 
 
 13
 Counsel for respondent argues that a non-processor who had an affiliate could not receive the extra subsidy while so affiliated; that respondent "allowed that affiliation to be cured during the subsidy period in certain cases, but not in cases of retail establishments." We do not perceive how, under the regulation, such a distinction can be made between an unaffiliated slaughterer "in certain cases," and an unaffiliated slaughterer, in other cases. The regulation relates to "unaffiliated slaughterers" and, as that term is defined in the regulation, it does not permit of exceptions being made on uncertain, arbitrary grounds in the manner contended for by respondent.
 
 
 14
 Respondent, Reconstruction Finance Corporation, however, submits that the problem in the case is not concerned with so-called affiliation; that the criterion of eligibility for the additional payments is solely whether the applicant for extra compensation sold 98% of his beef in the required forms; and that since complainant transferred more than 2% of his beef to his own retail meat market for sale in processed form, he can not be held to have sold 98% in the required forms, and hence was not an eligible non-processor under the terms of the controlling regulation.
 
 
 15
 The issue, therefore, is whether complainant's sales, or transfers, of beef to his retail meat market disqualified him as a "non-processor" of beef during the period upon which subsidies were based. For, unless he was a non-processor, he was not eligible for the extra compensation subsidy. Whether he was a non-processor depends upon whether, within the intendment of the regulation, he sold 98% of the beef produced by him in the four prescribed forms — carcasses, wholesale cuts, boneless beef, or ground beef, which forms were particularly defined in the regulation. Complainant submits that his "sales," or transfers, to his own retail meat market, were sales within the meaning of the regulation; and that, considering them as sales in prescribed forms, together with his other sales to strangers, his total sales amounted to more than 98% of the beef produced by him in the prescribed forms, and thereby qualified him as a non-processor eligible to the extra compensation. Respondent, Reconstruction Finance Corporation, insists that complainant, as a slaughterer, could not sell to himself as a retail meat market; that such sales amounted to more than 2% of the beef produced by him; that the beef, so "sold" to his retail meat market, was afterward sold by him, as the owner of the market, in processed form; and that, since less than 98% of his beef was sold by him in the prescribed non-processed forms, he was not eligible to extra compensation as a non-processor.
 
 
 16
 In the determination of the issue before us, it is of importance to consider the past history of complainant. In 1923, he operated a non-processing slaughterhouse in Hollister, California. In 1942, he sold this establishment and bought and operated another non-processing slaughterhouse in Gonzales, California. Prior to July, 1943, he discontinued operations in Gonzales and bought the slaughterhouse in Gilroy, California, which is the one he was operating during the years when the present controversy arose and with which we are here concerned.
 
 
 17
 Complainant had commenced operation of the "Public Drive-In Market" in 1923. This market was operated in connection with a grocery store owned by a third party. Both grocery store and meat market occupied a building owned by complainant; and it appears that the meat market was operated by him in order to retain the grocery store as a tenant in his building. The business of the retail meat market was, accordingly, carried on for about twenty-one years, until the agency in charge of subsidies notified complainant that, as a slaughterer, he could not qualify for the extra compensation subsidy, because his ownership of the meat market made him an affiliated slaughterer. He, therefore, sold the market, at cost of merchandise and fixtures, to be paid by the purchaser out of the future profits resulting from the operation of the market.
 
 
 18
 It, then, appears that complainant had, for a long period prior to the subsidy program, established and operated as two different business entities, physically separated, the non-processing slaughterhouse, and the retail meat market. Sales by the slaughterhouse, at wholesale prices, were billed to the retail meat market in the same manner as sales to outsiders.
 
 
 19
 Was complainant to be treated as conducting a non-processing slaughterhouse affiliated with a retail meat market, or was he properly denied the status of a non-processing slaughter establishment because of the fact that he sold at wholesale to his meat market, which subsequently sold the processed beef at retail? If he is to be deemed a non-processor affiliated with a retail meat market during the base period, upon which eligibility as a non-processor depends, then he could rid himself of the affiliation and thereafter qualify himself currently for the extra compensation. If he did not qualify as a non-processor during the base period, he was not "basically" eligible and could not become eligible thereafter for the extra compensation.
 
 
 20
 Under the regulations of the Office of Price Administration, it appears that it was the plan to recognize as separate establishments business entities owned by the same person. In its statement of considerations, when it adopted Revised Maximum Price Regulation 169, the Office of Price Administration expressly stated that it was intended to insure the flow of beef through ordinary channels and in conformity with the customary practices of the industry.[8]
 
 
 21
 At the inception of the price control program, the Office of Price Administration, in defining "seller," had provided that each separate place of business of a person was to be deemed a separate seller. It excepted, at first, from this general rule, separate places of business within a municipality or county. Later, the exception was changed to refer to "market area;" and a further exception was created with reference to certain kosher meat sales and sales to hotels and restaurants. Shortly prior to the extra-compensation program, in taking action to prevent evasion of its price ceilings by slaughterers who were receiving rebates from retailers for supplying them with beef, the Office of Price Administration declared that it did not intend to interfere with the status of slaughterers who also owned retail outlets. In its statement of considerations, it set forth that the "prohibition does not apply to the ownership and operation of a retail store by a slaughterer or wholesaler * * * The prohibition does not extend to cases where the slaughterer purchases unconditionally a retail establishment and operates that establishment for the sale of meat slaughtered by him. Such an arrangement cannot be recognized as an evasion of the regulation. The slaughterer assumes the full economic burden of maintaining the retail establishment. Only so long as he discharges that burden in full can he realize the benefits sought. And he assumes the risk of loss should the maintenance of the establishment for any reason become undesirable. The magnitude of the economic risk involved is a sufficient guarantee that the expedient will not be adopted to such an extent as to bring about the consequences previously explained. Moreover, there is precedent in the industry for this type of transaction, precedent which is wholly lacking for the evasive devices which the accompanying amendment expressly prohibits."[9]
 
 
 22
 From all the foregoing, it clearly appears that the Office of Price Administration recognized, in instances similar to the one before us, that a slaughtering establishment was a separate selling entity, distinct from a retail market, even where the latter was owned and operated by the former.
 
 
 23
 It is contended, however, by respondent, Reconstruction Finance Corporation that, because it is an entirely different agency from the Office of Price Administration, its activities and regulations are not controlled by the practices and regulations of the Office of Price Administration. Counsel for complainant argues that by analogy to the above mentioned regulations of the Office of Price Administration, the slaughterhouse and the retail market of complainant should be considered by the Reconstruction Finance Corporation as separate entities, and that the market should be held to be an affiliate of the slaughterhouse. In reply to this particular contention, counsel for the Reconstruction Finance Corporation declares that the price regulations of the Office of Price Administration are so voluminous that one can draw upon them to prove almost any point. The implications of this statement are indeed such as to cause concern in undertaking to ascertain the intention of those who promulgate regulations, in the search for their meaning. It is, however, to be observed, as was mentioned by counsel for complainant, that while the Office of Price Administration was the agency that had adopted a price ceiling which, without subsidies, would have been confiscatory in so far as a nonprocessor was concerned, the Reconstruction Finance Corporation was the agency which, by the payment of subsidies, was required to support the price ceiling and thus render it non-confiscatory.
 
 
 24
 With respect to the analogies between certain regulations of the Office of Price Administration and the Reconstruction Finance Corporation concerning slaughtering establishments, the Reconstruction Finance Corporation required a separate subsidy claim to be filed for each slaughtering establishment regardless of the fact that they might be owned by the same person.[10] Moreover, it required that slaughterers eligible for extra compensation be "unaffiliated slaughterers," defining that term as meaning "a slaughterer who does not own or control a processor or purveyor of meat, and who is not owned or controlled by a processor or purveyor of meat." The regulation of the Reconstruction Finance Corporation would, therefore, seem to evidence the intention of carrying out the concept of individual entities for each separate selling establishment and to treat a slaughterer and a retail meat market as "affiliated," in appropriate cases, even where owned by the same person.
 
 
 25
 As bearing upon the meaning to be given respondent's regulation, it is illuminating to observe how it was considered by the various officials of respondent during the course of passing upon complainant's claim to be regarded an applicant eligible for extra compensation. The agent in California of the Defense Supplies Corporation, the agency then in control of the matter, reported to the Washington Office that complainant had submitted the form to establish eligibility for extra compensation, but the investigation revealed that complainant Borelli, owner of the slaughterhouse, also operated a retail meat market, and that, therefore, he had advised complainant that he was ineligible to receive the extra compensation. In acknowledging this report from the agent in California, the vice president of the Defense Supplies Corporation informed the agent that he was correct in his view that complainant was not eligible for extra compensation, "since he owns a retail market." Subsequently, the agent informed the Washington Office that complainant had sold his meat market and that "it would appear that Mr. Borelli is entitled to the extra compensation on cattle from the date of sale * * * in February 1944. Please advise your determination in this matter." In reply, the vice president informed the California agent of the Defense Supplies Corporation that the form filed by complainant indicated that slightly more than 98% of his beef was sold at wholesale, but that a little more than 2% was "transferred to the affiliated retail market. Sales in all such cases must be sales to strangers and cannot include transfers or sales from one affiliate to another. Therefore, this slaughterer's actual wholesale sales in 1942 amounted to less than 98% of his beef production. Since the slaughterer cannot establish eligibility on the basis of his 1942 operation he cannot become currently eligible by divesting himself (of) control of the retail meat market."
 
 
 26
 In construing a regulation, where there is doubt as to its meaning, the rule is the same as that involving interpretation of statutes, and there may be considered the previously established policy, the policy designed to be promoted, and the spirit of the regulation, as well as its contemporaneous and practical construction. Holden v. Stratton, 198 U.S. 202, 25 S.Ct. 656, 49 L.Ed. 1018; United States v. Cooper Corp., 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071; Fleischmann Construction Co. v. United States, 270 U.S. 349, 46 S.Ct. 284, 70 L.Ed. 624; White v. Winchester Country Club, 315 U.S. 32, 62 S.Ct. 425, 86 L.Ed. 619. Complainant had been entitled to subsidies authorized by Regulation No. 3 of the Defense Supplies Corporation, during the base period. What he seeks, in effect, in this case is the additional subsidy authorized by Amendment No. 2 to that regulation. During the base period in which complainant was receiving the regular subsidies, it is conceded that it was perfectly proper and lawful for him, as a non-processing slaughterer, to own and operate, at the same time, the affiliated retail meat market in question; and there was nothing suggested in the law or regulations that would lead him to believe that he was, or would be, prejudiced in any way because of his operation of the two establishments. Thereafter, when Amendment No. 2 was promulgated, complainant divested himself of his meat market in order to receive the extra subsidy as an unaffiliated slaughterer; and he continued operating merely the non-processing slaughtering establishment in the same manner that he had always operated it. Since he operated as a non-processing slaughterer and sold wholesale to his affiliate when it was proper to do so, receiving the basic subsidy during that period, we see no reason why he could not afterward divest himself of his affiliate and qualify for the extra subsidy payable to unaffiliated slaughterers; and it is clear that no prohibition to such action is spelled out in the regulation.
 
 
 27
 When complainant divested himself of the retail meat market, he was in exactly the same position, profitwise, as any other non-processing slaughterer. The amendment to the regulation was directed at helping unaffiliated processors, and we are not persuaded that the allowance to complainant of the extra subsidy, under the circumstances disclosed in this case, has the result of permitting him to change his category from a processor to a non-processor in contravention of the spirit of the regulation. On the contrary, the allowance of such extra subsidy to the complainant is consonant with the spirit and the policy of the law and the regulation. Moreover, if we were to resort to contemporaneous construction as to the meaning of the regulation upon the assumption that it was ambiguous, we would be confirmed in our view. The agents and officials of the Defense Supplies Corporation, with full knowledge of the facts, considered that the retail meat market in question was an affiliate of the slaughtering business. These contemporaneous expressions of opinion are highly relevant and material evidence of the probable general understanding of the times and of the opinions of men who probably were active in the drafting of the regulation. See White v. Winchester Country Club, supra, 315 U.S. at page 41, 62 S.Ct. 425. The Defense Supplies Corporation was a wholly owned subsidiary of the Reconstruction Finance Corporation.[11] The Office of Price Administration, in its regulations, envisaged, as retail affiliates, companies or businesses that were owned or operated by a slaughterer. Authority for payment of subsidies, as a part of the price control program, was found in Section 2(e) of the Emergency Price Control Act.[12] Thus, the functions of the agency establishing the price control program and the agency providing for subsidy payments to support that program had their inception and existence in the same statute. The Office of Price Administration was an agency, therefore, closely related, in the price control program, to the Reconstruction Finance Corporation, and while their functions were not identical, they were intertwined and bound together for the same objective. It is a reasonable conclusion from the foregoing that it was the intention of the regulations providing for the extra subsidy in question to follow the pattern of the price regulations, for the support of which they were conceived and promulgated. And the price regulations recognized that a slaughtering establishment and a retail meat market owned by the same person were separate business entities; that the latter entity was an affiliate of the former; and that, within the intendment of the price regulations, such a slaughterer could sell at wholesale to such a meat market. Furthermore, it is to be emphasized that the regulation of the Reconstruction Finance Corporation, by its definitions of "a non-processing slaughterer," and an "unaffiliated slaughterer," recognized the distinction between a slaughterer selling at retail, who would occupy the status of a processor, and a non-processing slaughterer, who also conducted a retail business as an affiliate. Certainly, implicitly, at least, respondent, Reconstruction Finance Corporation, recognized that a non-processing slaughterer could sell, within the intendment of the regulation, to a wholly owned affiliate.
 
 
 28
 With regard to the claim advanced by respondent, Reconstruction Finance Corporation, that this action is barred by the six-year limitation against the filing of complaints in civil actions as provided by 62 Stat. 971, 28 U.S.C.A. § 2401, as well as the argument that complainant, in bringing his action, is barred by his laches, this contention was decided by this court adversely to respondent in Taylor & Richards, Inc. v. Reconstruction Finance Corporation, Em.App.1952, 193 F.2d 877.
 
 
 29
 In accordance with the foregoing, a judgment will be entered setting aside the order of the Reconstruction Finance Corporation of July 17, 1951, denying the complainant's protest, and remanding the case for further consideration and determination of the complainant's protest consonant with this opinion.
 
 
 30
 MAGRUDER, Judge, dissents.
 
 
 
 Notes:
 
 
 [1]
 50 U.S.C.A.Appendix, § 924(a)
 
 
 [2]
 Amendment 2 to Regulation No. 3, 8 F.R. 10826, 9 F.R. 1820
 
 
 [3]
 Section 14(b) of Amendment 2 to Regulation No. 3. (See Note 2)
 
 
 [4]
 Section 14(a)(1) of Amendment 2 to Regulation No. 3
 
 
 [5]
 Section 14(a)(2) of Amendment 2 to Regulation No. 3
 
 
 [6]
 Section 14(b) of Amendment 2 to Regulation No. 3
 
 
 [7]
 Section 14(a)(1), (2), and (b) of Amendment 2 to Regulation No. 3
 
 
 [8]
 7 F.R. 10381
 
 
 [9]
 Amendment 26 to Revised Maximum Price Regulation 169, 8 F.R. 11445
 
 
 [10]
 Sections 2 and 3(b) of Regulation No. 3; Section 8003.3 of Revised Regulation No. 3, 10 F.R. 4241
 
 
 [11]
 6 F.R. 2972
 
 
 [12]
 56 Stat. 26, 50 U.S.C.A.Appendix, § 902(e)